Virginia O'Callaghan, Administratrix of the Estate of Ella O'Callaghan, Deceased, Appellee, v. Waller & Beckwith Realty Company, Appellant.

Gen. No. 47,092.

First District, Third Division.

November 6, 1957.

Released for publication December 18, 1957.

Peterson, Lowry, Rall, Barber & Ross, of Chicago (A. R. Peterson, Harold W. Huff, and Herbert C. Loth, Jr., of counsel) for defendant-appellant.

James A. Dooley, of Chicago, for appellee.

JUDGE FRIEND delivered the opinion of the court. Ella O'Callaghan brought suit to recover damages for personal injuries sustained as the result of a fall

on the premises managed by the defendant, Waller and Beckwith Realty Company. Prior to the hearing she died of causes not associated with the injuries, and her daughter, Virginia O'Callaghan, who was appointed administratrix of her mother's estate, was substituted as plaintiff. Trial by jury resulted in a verdict in favor of plaintiff in the sum of $14,000, upon which judgment was entered. Defendant's post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, was overruled, and defendant appeals.

The essential facts disclose that Waller and Beckwith Company was engaged in the rental and management of real estate properties and maintains an office in the Pattington Apartments located at 660–700 Irving Park Road in Chicago. The building consisted of ninety-three apartments, with entrances from both Irving Park Road and Bittersweet Place. In the rear of the building there was a courtyard, in the extreme northeast corner of which were six private garages with accommodations for twelve cars. There was no public alley, the garages being accessible by a private driveway which extended from Irving Park Road along the east side of the building to the courtyard or from a driveway at the west end of the courtyard connecting with Bittersweet Place.

Prior to the summer of 1947 Mrs. O'Callaghan and her daughter lived at 4516 Greenview Avenue in Chicago. Because the owners of those premises wanted to remodel, the O'Callaghans were served with notice to leave. At that time Ambrose O'Callaghan, Mrs. O'Callaghan's son, was living in the Pattington Apartments, and through him Mrs. O'Callaghan made application to Waller and Beckwith Realty Company for an apartment in the building. She was subsequently notified that an apartment was available and signed a lease. In August or September of 1947 she and her

daughter took possession under the lease and occupied the apartment under the provisions of the lease and amendments thereto and subject to the OPA regulations imposed upon the parties by operation of law. The provisions of the lease were set out in paragraph form, each paragraph being numbered and titled, the title appearing in large type in the margin. The provision relevant to a consideration of this case reads as follows: "LESSEE WAIVES DAMAGES 8. Neither the Lessor nor his agent shall be liable for damages, to the Lessee or to any person claiming through Lessee (nor shall rent be abated) for injury to person or damage to or loss of property wherever located from any cause or for damage claimed for eviction actual or constructive; this provision includes particularly but not exclusively all claims arising from the building or any part thereof being or becoming out of repair including appurtenances, equipment, furnishings, fixtures or apparatus located in the demised premises or in the building or premises of which said demised premises are a part, or from any act or neglect of Lessor or his agents or of any tenant or occupant of such building or of the premises of which such building is a part, or of the neighboring property."

At the time that the O'Callaghans first occupied the apartment there was no garage available. However, in June 1951 a garage stall became vacant, which Miss O'Callaghan rented for her car and which she used until the time of her mother's accident in October 1952. The area between the garages and the apartment building was paved with cement, and at a point approximately in front of the most westerly of the garages there was a drain in the courtyard which is alleged to have become defective and to have caused the injury.

The accident occurred October 17, 1952, when Mrs. O'Callaghan was approximately seventy-seven years old. On the afternoon of the day in question Miss

O'Callaghan, a teacher, returned home from school between three and four o'clock and picked up her mother. They went to the home of a relative for dinner, and returned between eight-fifteen and eight forty-five. They drove into the courtyard, where Miss O'Callaghan circled around, bringing her car to a stop, from which she intended to back into her section of garage No. 4. Since each garage accommodated two cars, only one of the two swinging doors had to be opened for entrance. Miss O'Callaghan turned on the light as she opened the garage door and then returned to her car. Meanwhile, her mother had gotten out of the car, presumably through the right front door, and had walked south toward the building. In the illumination of her car headlights Miss O'Callaghan saw her mother near the building line; she was facing south and was slightly west of the car. Then Miss O'Callaghan gave her entire attention to garaging her car; and since this necessitated her paying particular attention to clearance between the left front of the car and the wall of the building, she did not again glance at her mother. As Miss O'Callaghan started to back the car into the garage, she heard her mother scream. She stopped her car immediately, got out, and went around to the right side. Her mother was lying on the ground, her position suggesting that she had fallen toward the west, her feet approximately two feet from the drain. A tenant and the janitor were called, and both came to the scene; within a short period of time Mrs. O'Callaghan was taken to a hospital.

The paramount question presented is whether the provisions of Paragraph 8 of the lease, hereinbefore set forth, bar recovery by plaintiff in this proceeding. Defendant relies primarily on the recent case of Jackson v. First Nat. Bank of Lake Forest, 415 Ill. 453, and Hyman v. 230 South Franklin Corporation (Abst.), 7 Ill.App.2d 15, which was decided upon the authority of

the Jackson case, for the contention that the exculpatory clause in the lease signed by plaintiff's decedent was not void as being contrary to public policy, as plaintiff asserts. In the Jackson case plaintiff, who operated a tailor shop in the building involved, sustained personal injuries as the result of a fall down a basement stairway when a defective railing broke. An exculpatory clause was successfully asserted as a defense in that case, and thus the question whether this clause was void as repugnant to public policy was squarely presented to the court. The attitude of the courts in this state toward the private business dealings of individuals between themselves is stated by the Supreme Court to be as follows: "An examination of the authorities in other jurisdictions leads us to the conclusion that by the great weight of authority the rule is that an exculpatory clause, specifically or generally providing that the lessor shall not be liable for damages or injuries to the lessee or his property from all or certain causes, is not against public policy but is valid and enforceable . . . . The cases emphasize that there is nothing in the lessor-lessee relationship which in and of itself militates against the validity of such agreements; that such agreements relate to the private affairs of the parties and their private business; that they are not a matter of public concern." However, in another part of the opinion the court pointed out that effect will be given to a particular contractual agreement to relieve a party from the consequences of his own negligence "unless (1) it would be against the settled public policy of the State to do so, or (2) there is something in the social relationship of the parties militating against upholding the agreement." The Jackson case being precisely in point on the question of public policy in Illinois, plaintiff's counsel urges that the provision should not be enforced because of the second proviso of the reservation,

and contends that because of the ·relative inequalities in the bargaining powers of the parties, the exculpatory-agreement clause should not be enforced. A distinction is sought to be made between the Jackson and the Hyman cases (both involving construction of a business-property lease) and the proceeding at· bar. With respect to this contention, premised on the social relationship between the contracting parties, plaintiff cites and relies on the annotation in 175 ALR Limiting Liability for Own Negligence (1948) § 6, the text of which is as follows: "When it comes to the question of measuring the relative bargaining power of the parties no definite rules exist to guide the courts. While never referred to expressly, two factors seem to be outstanding as of primary consequence: the importance which the subject matter of the contract has for the physical or economic well-being of the party agreeing to release the other party from liability for the latter's negligence, measured not in terms of individual but of class importance, and the existence and extent of competition among the group to which the party to be exempted by the clause belongs, measured by the amount of free choice the party can actually exercise who is to agree to the exemption." The annotator in a subsequent section (§ 48) says that "parties who at one time may have been generally considered to deal on an equal footing with each other may under changed circumstances clearly be in an unequal position. A fairly recent example [this volume was published in 1948] of this change in bargaining power is afforded by the relationship between landlord and tenant. No one can seriously pretend that at present anything approaching equality exists here, and some of the courts under the guidance of the legislatures have taken cognizance of this change."

A consideration of this viewpoint immediately raises the question as to whether the parties to this proceed-

ing were dealing at arm's length and on equal terms. It is to be conceded that during the period under discussion apartments were in demand, but it is sound real estate management for the lessor to select, on terms advantageous to him, those applicants who would be most desirable as tenants; a rental agent owes such a duty to his principal. Mrs. O'Callaghan was interested in renting an apartment in the building in which her son lived, and evidently through his intervention she was successful in obtaining a lease there. There is no evidence to suggest that she made an attempt to rent an apartment elsewhere. Plaintiff's sole complaint is that in order to obtain an apartment in this particular building Mrs. O'Callaghan was required to sign the same lease required of all other tenants (it was a Chicago Real Estate Board form of lease); that if she had refused to sign the lease with the exculpatory clause she would not have been accepted as a tenant. But the final choice was Mrs. O'Callaghan's—whether she was sufficiently interested in leasing an apartment at the Irving Park Road address to agree to the exculpatory clause, or whether she preferred to find an apartment elsewhere under a different leasing arrangement. The evidence offered in this case does not suggest a situation of over-reaching, of unfair dealing or of unequal opportunity such as would meet the requirement for the invalidation of the contract here under consideration.

■■■ In support of his proposition that contractual provisions relieving a party from the legal consequences of future tortious or illegal conduct have been held contrary to public policy and void, plaintiff's counsel cites Kenna v. Calumet Hammond and Southeastern R. Co., 206 Ill. App. 17, aff'd 284 Ill. 301, and Consolidated Coal Co. of St. Louis v. Lundak, 97 Ill. App. 109, aff'd 196 Ill. 594. Both cases involved special statutory regulations. The rule sought to be

355

deduced from them is contrary to the express statement of the Jackson case, namely, that an exculpatory clause in an agreement is not per se in violation of the public policy of this state. It should also be noted that in the field of indemnity contract law, which involves principles similar to those in the case at bar, the trend has been toward extending the principle of freedom of contract, as against the argument that an agreement indemnifying one against the consequences of his own negligence is void as against public policy. Under Russell v. Shell Oil Co., 339 Ill. App. 168, and Northern States Co., Inc. v. Finkl & Sons Co., 8 Ill.App.2d 419, there is no doubt of the validity of such contracts in this state; see also Indemnity Insurance Co. v. Koontz-Wagner Electric Co., 233 F.2d 380.

Bisso v. Inland Waterway Corp., 349 U. S. 85, is cited by plaintiff's counsel. That was an admiralty case, and by its terms is limited to the decision as to admiralty law and is not an authority as to the law in this state.

In Kay v. Cain, 154 F.2d 305, plaintiff-tenant sustained personal injuries as the result of falling over a milk bottle on an uncovered and unlighted outside stairway by which she was returning to the building at night. There the lease provided that the lessor should not be liable for any damage arising from "any cause" in or about the building or demised premises, whether caused by or resulting from bursting, leaking or overflowing of any water or steam pipes or "other cause" whatsoever; under the principle of ejusdem generis, the court held that the quoted phrases did not refer to negligence in failing to light a public stairway. Although this ruling precluded the necessity for the court to construe the exculpatory clause of the lease, it stated, by way of obiter dicta, that "it is doubtful whether a clause which did undertake to exempt a landlord from responsibility for such negligence would now be valid. The acute housing shortage in and near

356

the District of Columbia [the case was decided in 1946] gives the landlord so great a bargaining advantage over the tenant that such an exemption might well be held invalid on grounds of public policy."

In the recent (1955) New Jersey case of Kuzmiak v. Brookchester, Inc., 33 N. J. Super. 575, 111 A.2d 425, plaintiff brought suit against the landlord to recover for personal injuries sustained when she fell down a stairway in defendant's apartment building, allegedly due to negligent construction and maintenance of nuisance in connection with such stairway. The defendant in its answer set up by way of affirmative defense a provision in the lease exculpating it from any liability. The trial court ordered that plaintiff's complaint be dismissed by reason of the provisions of said lease and entered summary judgment in favor of defendant. Plaintiff appealed, and the decision of the reviewing court contains a comprehensive discussion of the exculpatory clause in residential leases and its construction in the various states. From a study of the various sources and of decisions in various jurisdictions, "we find," the court said, "that there is a sharp division of opinion on the specific subject," some jurisdictions adhering strictly to the freedom of contract concept, holding that a lease is a matter of private agreement with which the general public is not concerned and that if a tenant enters into a contract releasing the lessor from liability for negligence, the law must give effect to and enforce such a contract, other jurisdictions holding that one may not by contract relieve himself from the consequences of the future nonperformance of his common-law duty to exercise ordinary care. The Illinois case of Cerny Pickas & Co. v. C. R. Jahn Co. (1952), 347 Ill. App. 379, was cited to suggest that Illinois law viewed exculpatory-lease clauses with disfavor as being against public policy, but evidently the New Jersey court was not familiar with the later Illinois Jackson case (1953) which, as already fully

discussed here, held that contracts with exculpatory clauses are generally enforced except for certain specified reasons. It should be noted that on the authority of the Jackson case the defendant in the Cerny Pickas case ultimately prevailed in the Illinois Supreme Court (Cerny Pickas & Co. v. C. R. Jahn Co., 7 Ill.2d 393) where the case was decided after being passed on a second time in the Appellate Court (4 Ill.App.2d 164). The Supreme Court said: "The case was first decided on the pleadings. A judgment was entered in favor of the lessee upon the ground that the provisions of the lease, as a matter of law, completely exonerated it from liability for loss due to fire. Upon appeal the Appellate Court for the First District held that, because of considerations of public policy, exculpatory provisions in contracts should not be construed to exempt a party from liability for loss resulting from its own negligence or the violation of a positive duty imposed by law, and that the provisions of the lease were not a bar to recovery. (347 Ill. App. 379.) This judgment of the Appellate Court was interlocutory, and so was not subject to review by this court. After the case was remanded, and before it was tried upon the merits, this court, in Jackson v. First Nat. Bank of Lake Forest, 415 Ill. 453, expressed different views with respect to the public policy applicable to exculpatory clauses in leases." The New Jersey court considered the effect of legislative interest on the problem, the weighing of the relative bargaining power of the parties as a factor in any given decision, and quoted with approval the conclusion reached in an article reported in 15 Ga. Bar J. 389 (1953) that " 'a large majority of the courts continue to approach the subject *de novo* each time a case involving an exculpatory clause becomes a subject of litigation.'

"Generally," the New Jersey court said, "the trend of decisions has been to hold that exculpatory clauses

358

cannot immunize a landlord from responsibility for his acts of active wrongdoing. 'Active wrongdoing,' 'affirmative negligence' and 'misfeasance' have the same essential connotation; and, in short, may be said to be negligent act of commission. The distinction between these and nonfeasance is discussed in a line of cases," citing New Jersey decisions. The court in the Kuzmiak case considered the exculpation there attempted as so all inclusive and broad as to immunize against every conceivable wrongdoing, including affirmative acts of negligence and violations of positive statutory duty, and held that as to such conduct and acts it has always been the policy of the law to hold an exculpatory clause invalid. It ruled that the judgment of the trial court was erroneous "(1) whether we hold the exculpatory clause to be invalid on the ground that it is contrary to public policy because of the unequal bargaining positions of the parties, or (2) because the plaintiffs should have been permitted to prove that the injuries resulted from active negligence or nuisance."

█ With respect to the distinction sought to be drawn between a residential and a business lease, plaintiff's counsel argues that "at best, the tenant in a residential property is not in the same position as the tenant of a business property since he is not as likely to have available the knowledge and skill, either himself or through consultants whom he is able to hire, to determine exactly the risks which he takes with respect to any given building." The evidence in the case at bar does not warrant any such distinction. Even though this was a letting of residential property, it was nevertheless a lease executed in the business of the defendant, and the liability asserted against defendant certainly arises out of the operation of the business of defendant. The essential issue is whether or not there is anything in the relationship of the parties which is so unfair to one that it can be said as

359

a matter of law that their contract does not represent the act of a free person. Mrs. O'Callaghan sought a judgment against defendant for premises allegedly becoming out of repair. She agreed in writing that she would assert no such liability, and whether or not she read the lease, the evidence is clear that she and her daughter were invited into the offices of defendant, that the lease, with the exculpatory clause clearly identified, was presented for signature, that Miss O'Callaghan, a school teacher, was an educated person, and that presumably Mrs. O'Callaghan could also read. Upon the facts of this case, we think that the rule enunciated by our courts requires us to hold as valid the agreement between the parties to this suit.

Much of the testimony adduced upon trial was directed to the condition of the drain in the center of the courtyard. This evidence was offered in support of plaintiff's contention that a defect in the drain was responsible for the injury. Defendant, on the other hand, argues that there was not sufficient evidence of negligence to warrant the submission of that question to the jury.

In view of our ruling that the exculpatory clause of the lease is valid, it becomes unnecessary to discuss this evidence₀or to decide the respective contentions of the parties. If the exculpatory clause is valid, as we hold, the court should have directed a verdict as a matter of law in favor of defendant, and failure to do so constitutes reversible error. Accordingly, the judgment of the Superior Court against defendant is reversed, and the cause remanded with directions that judgment be entered in favor of defendant.

Judgment reversed and cause remanded with directions.

BURKE, P. J. and BRYANT, J., concur.