Samuel L. Simmons, Appellant, v. Columbus Venetian Stevens Buildings, Incorporated, Appellee.

## Gen. No. 47,258.

First District, Third Division.
February 28, 1958.
Additional opinion, February 4, 1959.
Rehearing denied February 4, 1959.
Released for publication February 4, 1959.

1

■■■■■■■■■■■■■■■■■■■■■■■■

Mages and Sachs and John J. Wallace, of Chicago (Jack L. Sachs, of counsel) for appellant.

Hinshaw, Culbertson, Moelmann & Hoban, of Chicago (Oswell G. Treadway, of counsel) for appellee.

JUSTICE BRYANT delivered the opinion of the court.

The plaintiff, appellant here, is a tenant of the defendant, appellee. The action is for damages for injuries to the plaintiff allegedly caused by the negligence of the defendant in the maintenance of the halls and stairways. The defendant asserts as an affirmative defense the existence of an exculpatory clause in the lease existing between the parties. Judgment for the defendant was entered in the trial court on the pleadings.

The error of which the plaintiff complains is that the trial court abused its discretion in allowing the filing of a pleading setting forth an affirmative defense two years and seven months after the complaint was filed and after the jury had been selected and sworn and was ready to try the issues, and that the trial court further erred in entering a judgment for the defendant based on the affirmative defense filed, which set forth an exculpatory clause in the lease between the plaintiff and the defendant.

As this judgment was entered upon the pleadings, it becomes necessary to consider them in detail.

The complaint was filed by the plaintiff on October 1, 1954. It set forth, among other things, that the defendant on March 3, 1953 was possessed of and had charge and control of and was operating certain premises located at 31 North State Street in Chicago, Illinois, which was an office building, to which the general public was invited to come, and that he, the plaintiff, was on that day exercising ordinary care for his own safety and was rightfully in the premises at the invitation of the defendant, and that it was the duty of the defendant to exercise ordinary care to have the premises in a safe condition for the use of the plaintiff, and that at the time aforesaid the defendant negligently and improperly equipped, managed, conducted and kept the office building and stairs thereto, and, because of the negligence of the defendant, the plaintiff in walking upon said steps was caused to step upon certain vegetable debris, oil, wax or defectively worn marble steps, and he was caused to slip, stumble, trip and fall down upon the floor with great force and violence, and that as a proximate result of the negligence of the defendant the plaintiff was greatly hurt, bruised and wounded, and divers bones of his body and limbs were broken, crushed and maimed, and he sustained severe and permanent injuries to various parts of his body, and he asked for damages of $50,000.

The defendant answered that on the date alleged it was possessed of and in charge of those portions of the premises described in the complaint which were not under the exclusive control of the tenants thereof, and admitted that the building was laid out and equipped as an office building. It denied that the plaintiff was in the exercise of due care and denied its own negligence or improper conduct, and denied that the plaintiff suffered the injuries alleged, but says

4

"that it was its sole duty to exercise ordinary care in the operation, management and control of that portion of the premises which was not under the exclusive control of the tenants thereof."

Upon notice and petition the court ordered the cause advanced for trial, and later, upon notice, a rule was served upon the plaintiff to submit to a physical examination, which he did, and thereafter interrogatories were submitted by the defendant and answered. Then the cause was assigned for trial.

After two days had been consumed in the picking of a jury the defendant filed its motion for summary judgment, setting forth for the first time in the record that the plaintiff was a lessee of the defendant on March 3, 1953, and attached a photo copy of the lease and set forth the exculpatory clause in the lease, which is as follows:

"6. Waiver of Certain Claims: The Lessor shall not be liable, and the Lessee waives all claims for damage to person or property sustained by the Lessee or by any occupant of the Building or premises or by any other person resulting from the Building or any part of it or any equipment or appurtenance becoming out of repair, or resulting from any accident in or about the Building, or resulting directly or indirectly from any act or neglect of any tenant or occupant,of the Building or of any other person. . . ."

and claimed as a matter of law that by virtue of the provisions of the lease the plaintiff was not entitled to recover against the defendant for damages. The court, after hearing the defendant's motion for summary judgment, overruled the motion without prejudice, gave the defendant leave to file within five days its amendment to its answer, and the plaintiff leave to plead or reply thereto within five days.

Subsequent to that order the defendant filed a further additional and affirmative defense, setting forth

the existence of the lease and the provisions of the exculpatory clause, as set forth in the previous motion for summary judgment, and prayed for the entry of a judgment in favor of the defendant.

The plaintiff then filed his motion to strike the further additional and affirmative defense filed by the defendant, in which he set forth the filing of the complaint, filing of the answer, the subpoenaing of the records of the Columbus Hospital and the taking of the deposition of the plaintiff by the defendant, the motion to advance and the granting of the motion, the order for examination and the physical examination of the plaintiff by the defendant, the filing of interrogatories and the answers thereto, and pointing out that the first record of the affirmative defense was after the jury had been selected, which was in April 1957, and that the complaint had been filed in October 1954, and the fact that in the original answer, which had not been withdrawn, the defendant had alleged its duty, as heretofore set forth, and pointed out that the plaintiff was 74 years of age. The trial court overruled the plaintiff's motion to strike and gave five days to reply to the affirmative defense.

The defendant then moved for the involuntary dismissal of the cause or for judgment on the pleadings in the alternative to the motion for summary judgment, setting forth the exculpatory clause and urging its legal effect and alleging that because of it the complaint was insufficient in its allegations in regard to negligence. The plaintiff then filed his reply to the further additional affirmative defense in which he admitted the existence of the lease and that he occupied a certain portion of the building at 31 North State Street in pursuance to the lease and that it was in that building that he received his injuries; that at the time the lease was submitted to him, on or about December 1, 1952, he was told by the landlord or his

6

duly authorized agent to sign the lease and return it to the defendant prior to January 1, 1953 or he would have to vacate the premises. Plaintiff also filed his further reply to the additional and affirmative defense, stating that he rents only the portion of the premises at 31 North State Street known as Room 901, located on the west side of the building; that the accident occurred in that portion of the stairway located between the 9th and 10th floors on the southeast side of the building and that the stairs are open and used by both the general public and the tenants of the building and that it is not a part of the premises leased to the plaintiff; that the building is a skyscraper containing more than 100 tenants, consisting of numerous retail jewelry establishments, wholesale jewelry establishments, manufacturing jewelers and numerous other retail establishments to which the general public is invited, expressly or by implication, and that the building is visited by thousands of the general public every week and that they use said public stairway. He also sets forth that except for the period between 1920 and 1923 he has been a tenant of the building for 37 years, engaged in the business of the manufacture of fine jewelry by hand and that he maintained his office and workshop in the premises; that 80 per cent of his business is derived from tenants in defendant's building; that if he was obliged to vacate the premises for his failure or refusal to sign the lease he would lose more than 80 per cent of his normal volume of business, which, because of the fact he was 74 years of age, means that plaintiff would be obliged to discontinue his business, and that because of these facts he would have executed any lease presented to him by the defendant provided the rental was not prohibitive. Plaintiff further alleges that there was disparity of bargaining power between the parties to the lease, so that to enforce it would result in great injustice;

7

that he had no freedom of choice in entering into the lease; that he had either to accept what was offered or be deprived of the advantages of remaining as a tenant in the building; that plaintiff was not able to deal at arm's length with the defendant and upon equal terms, so that the social position or social relationship of the parties is opposed to and diametrically in conflict with the operation of the exculpatory clause of the lease, and the plaintiff asked for an immediate trial.

The defendant filed a motion to strike certain portions of plaintiff's reply, which motion to strike was overruled by the court, and thereafter the following order was entered by the trial court:

"This cause having come on to be heard upon the complaint herein, the answer of the defendant thereto, the further, additional and affirmative defense, including a true and correct copy of a lease marked 'Defendant's Exhibit A' attached thereto, plaintiff's reply to the further, additional and affirmative defense and further reply to further, additional and affirmative defense, and upon defendant's motion in the alternative, for dismissal or for judgment on the pleadings, due notice having been given, the parties hereto being present by their counsel, and the court, being fully advised in the premises, having heard arguments of counsel, doth find that the court has jurisdiction of the subject matter of this cause and the parties thereto.

"The court further finds that the said lease existing between plaintiff and defendant at the time set forth in plaintiff's complaint is a valid and subsisting lease containing an exculpatory clause binding upon the parties, and therefore finds the issues in favor of the defendant.

"Now, therefore, in consideration of the premises, it is hereby ordered, adjudged and decreed that judg-

8

ment be and the same is hereby entered for the defendant.

"Therefore, it is considered by the court that the plaintiff take nothing by his said suit and that defendant go hence without day, no costs to be assessed against either party."

It is of course true that if the defendant had filed the affirmative defense in regard to the exculpatory clause at the time it filed its original answer, there would have originally arisen the question of law, upon which this case was decided in the trial court, and its ultimate determination would have been advanced by years—years which are of extreme importance to a man 74 years of age. This had the effect of denying the plaintiff the speedy justice to which he was entitled, and there is no explanation in the record as to why the defendant proceeded in the manner so detrimental to the plaintiff's interest.

On the other hand, there is to be set off against that argument the fact that if the defendant has a good defense at law, it would appear to be a great injustice not to allow that defense to be submitted to the court by the defendant, even though its conduct in presenting it was not entirely free from culpability. It is also to be noted that the incident occurred March 31, 1953, and that the complaint, filed October 1, 1954, alleged plaintiff's position as an invitee, while he must have known, and is certainly chargeable with notice not only of the lease but also of its terms.

■■ It is certainly the tendency of justice in our age that causes should not be determined by the technicalities of procedure but the court should attempt to do substantial justice when all the facts are completely disclosed. The provisions of the Illinois Revised Statutes, chap. 110, sec. 46(1), being the Civil Practice Act, provide liberally for amendments to pleadings at any time before the final judgment. And

9

the rule is stated in 30 I. L. P., Pleading, sec. 108, p. 84 as follows: "Within statutory limits, the time when a pleading may be amended rests largely in the sound discretion of the trial court, whether application for leave to amend be sought after issue has been joined, during the trial, after the close of the evidence or conclusion of the trial, or before or after the verdict." These facts and this rule certainly leave the matter one of discretion with the trial court, and we are not prepared to say there was any abuse of discretion in denying the summary judgment, allowing the filing of the amendment to the answer to the complaint as an affirmative defense, and the filing of a reply thereto and the entry of a judgment on the pleadings as a matter of procedure.

As late as 1953, in the case of Jackson v. First Nat. Bank, 415 Ill. 453, the Illinois Supreme Court, in a well reasoned and carefully considered decision, found that as far as the State of Illinois was concerned there was nothing contrary to its public policy in the use of exculpatory clauses in leases between landlords and tenants, and pointed out that such agreements were purely private affairs and that there was no evidence of disparity of bargaining power between the parties; and, in a factual situation involving an injury which took place on a stairway used in common by the tenant and others, held that a clause very similar to the one in the instant case was sufficiently broad to cover the waiver of the tenant's rights to proceed against the defendant because of the alleged negligent conduct in operating, maintaining or repairing its building, and that such a clause was valid and enforceable. And again, in 1955, in the case of Cerny-Pickas & Co. v. C. R. Jahn Co., 7 Ill.2d 393, the court referred to its decision in the Jackson case and stated that the effect of public policy upon exculpatory clauses in leases had been considered and that it was not necessary to repeat it.

10

We recently had before us a case (O'Callaghan v. Waller & Beckwith Realty Co., 15 Ill.App.2d 349) where the plaintiff, as a tenant, had signed with the landlord a form lease containing an exculpatory clause and had not questioned the clause. The evidence showed she was required to move from her previous apartment and that she wanted this apartment to be near a relative. We held that the clause was sufficiently broad to cover the condition alleged to be the cause of the injury and that under the circumstances of that case we were bound by the decision in the Jackson case and that the tenant had waived her right against the negligence of the landlord and could not recover. The frequency with which these cases arise and the very basic nature of the questions of public policy involved, cause us to consider the underlying principles affecting the public policy to see if any real difference exists from the Jackson case which would warrant us coming to a different conclusion in this matter.

The public policy of any given jurisdiction is usually determined by its constitution, legislative enactments and its judicial decisions. People ex rel. Nelson v. Wiersema State Bank, 361 Ill. 75, 86. "The meaning of the phrase 'public policy' is vague and variable; there are no fixed rules by which to determine what it is. It has never been defined by the courts, but has been left loose and free of definition . . . ." Steele v. Drummond, 275 U. S. 199, 205. "There is no precise definition of public policy, and consequently no absolute rule by which a contract can be measured or tested to determine whether or not it is contrary to public policy. Each case, as it arises, must be judged and determined according to its own peculiar circumstances." First Trust & Savings Bank v. Powers, 393 Ill. 97, 102.

The questions of public policy which are in conflict in exculpatory clause situations are: (1) A person

should be liable for the negligent breach of a duty which he owes to another, and, (2) A person should have the right to freely contract about his affairs.

The first, relating to liability for negligence, is based largely upon decisions of the courts, buttressed sometimes by statutory enactment, and seldom, if ever, mentioned in constitutions. Its foundations rest broad and deep in the history of the common-law. The common-law developed the rights and obligations of the parties to certain relationships and determined that damages be awarded for the negligent breach of those obligations. Typical examples of these relationships and obligations are, carrier and passenger, employer and employee, innkeeper and guest, bailee and bailor, and landlord and tenant.

The right of the freedom to contract, also rests deeply in the common-law. That right is frequently limited by legislation—and thus acknowledged and recognized, even when not avowed by legislative enactment. By judicial decision it has been suspended on the due process clauses of our constitutions. This suspension is explained and discussed in the case of Adkins v. Children's Hospital, 261 U. S. 525, 545, where Justice Sutherland, speaking for the majority of the court, said:

"The statute now under consideration is attacked upon the ground that it authorizes as unconstitutional interference with the freedom of contract included within the guaranties of the due process clause of the Fifth Amendment. That the right to contract about one's affairs is a part of the liberty of the individual protected by this clause, is settled by the decisions of this Court and is no longer open to question."

And the tenuity of that suspension is set forth by Justice Holmes in his famous dissenting opinion in that case, on page 568, where he said:

12

"But in the present instance the only objection that can be urged is found within the vague contours of the Fifth Amendment, prohibiting the depriving any person of liberty or property without due process of law. To that I turn.

". . . Contract is not specially mentioned in the text that we have to construe. It is merely an example of doing what you want to do, embodied in the word liberty. But pretty much all law consists in forbidding men to do some things that they want to do, and contract is no more exempt from law than other acts. Without enumerating all the restrictive laws that have been upheld I will mention a few that seem to me to have interfered with liberty of contract quite as seriously and directly as the one before us."

He then proceeded to cite numerous statutory restrictions upon the right to contract, starting with such general things as usury laws and going to such minutiae as the size of a loaf of bread.

That case involved the act which fixed a minimum wage for women in the District of Columbia, and was held to be unconstitutional. Later a minimum wage act, for women in the State of Washington, was approved by the Supreme Court of the United States as not being in derogation of the freedom of contract, and the Adkins case overruled. Chief Justice Hughes in that case (West Coast Hotel Co. v. Parrish, 300 U. S. 379, 391–392), discussed the right to contract as follows:

"In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation the Constitution does not recognize an ab-

13

solute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. . . .

"This essential limitation of liberty in general governs freedom of contract in particular. More than twenty-five years ago we set forth the applicable principle in these words, after referring to the cases where the liberty guaranteed by the Fourteenth Amendment had been broadly described:

" 'But it was recognized in the cases cited as in many others, that freedom of contract is a qualified and not an absolute right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.' Chicago, B. & Q. R. Co. v. McGuire, 219 U. S. 549, 567."

■■■ In addition to these legislative-judicial limitations upon the rights of citizens to freely contract, from the first there have been certain fields in which that liberty has been curtailed and it has been held improper to contract. It has always been held that a contract to commit a crime or to give a reward for the commission of a crime, or to contract to violate essential morality or based upon an immoral consideration, is invalid. 12 I. L. P., Contracts, sec. 154. It has also been held that a contract which is based on an illegal consideration or is designed to accomplish an unlawful purpose or object, is void. 12 I. L. P., Contracts, sec. 151. It has also been generally held that contracts in violation of public policy are void, such as contracts which purport to relieve the husband of the obligation imposed on him by law to support his wife. 12 I. L. P., Contracts, sec. 160.

14

The conflict of these two public policies—the obligation to be liable for one's negligence, and the freedom of the right to contract—has been considered differently in many jurisdictions.

The State of New Hampshire, alone, has held in all these relationships that the public policy of protecting against the negligence of individuals in causing injuries, was transcendant and could not be waived by contract. In the case of Wessman v. Boston & Maine Railroad, 84 N. H. 475, at pages 478–479, this policy is clearly stated and its wide application explained, as follows:

"The policy of this state with reference to contracts designed to relieve a party from the consequences of the non-performance of his common-law duty to exercise ordinary care has been so plainly stated as to permit of only one conclusion. . . . 'It is against the policy of the law to permit anyone . . . to relieve himself by contract from the performance of his common-law duty to use ordinary care to avoid injuring those with whom he knew or should have known his business would bring him in contact.'

". . . it appears that the real reason for the rule is to be found in the cardinal importance attached to the doctrine of ordinary care in this state. . . . 'Everyone in the conduct of his lawful business is bound to act with this degree of care, and if he fails to do so is responsible for the consequences. . . .'

"The unvarying application of this rule to varying relationships has frequently been exemplified. . . .

"It is the declared policy of this state that the operation of this rule, which is reasonable in theory and salutary in effect, shall not be interrupted by private contract."

The policy seems to be grounded in the inconsistency that society should work through many years to establish the rights and obligations of the parties to a legal

relationship and, once those priceless principles are established, that people could throw them away in the name of freedom of contract and submit themselves to the very hazards and dangers from which those principles were established to protect them. It might have been the policy everywhere that freedom to contract should yield in all cases where the contract would destroy the obligation to use due care.

Other states have uniformly started with opposite points of view from New Hampshire. Their controlling public policy is that individuals must be free to contract in a nearly unlimited manner. They relegate to a subservient position the public policy that people are liable for their negligence which causes damage to others. The courts have seemed not to be too sure of this relative ranking of public policies, however, and on occasions have held contracts void by deviating and, sometimes, devious reasonings. The principles most generally relied upon to declare certain contracts void, are: that the persons who make the contract are in an unequal bargaining position, or, that there are some social consequences of the contractual relationship which require that the contract be held void. These principles obviously lack definiteness, and have often been employed without any attempt to define them.

In some situations the courts have applied doctrines of strict construction, so straining the obvious intent that it has resulted in the practical emasculation of the clauses.

In other jurisdictions, in order to relieve from social disturbance, the legislatures have declared such contracts, as applied to certain relationships, contrary to public policy. All of this has resulted in a substantial deviation from the policy of freedom of contract. It has created ambiguity and lack of uniformity in the law as far as many of the relationships are concerned.

16

As in most states, in Illinois the results have varied, largely based upon the difference in the type of relationship which created the duty from which it was sought to relieve the negligence.

In the carrier relationship the majority rule holds that the carrier cannot by contract relieve itself from loss resulting from the negligence of itself or its agents. 9 Am. Jur., Carriers, sec. 739, page 874. It has been said if there is any general reason for the rule to be deduced from the passenger cases, it is that the public service consideration alone prevents contractual limitation of liability for negligence. 28 Harvard Law Review 550, 560. It is also said that proper solicitude for human safety requires a carrier of passengers not to diminish its liability to them, but that the main factor is the relative bargaining power of the parties. 37 Columbia Law Review 248, 255. Williston on Contracts says that a provision avoiding liability is peculiarly obnoxious where a relationship requires of one party greater responsibility than that required of the ordinary person. Vol. 6, sec. 1751C, page 4968. Illinois follows the majority rule, upon the rationale that a semi-public relationship exists between common-carriers and passengers and shippers. In the case of Checkley v. Illinois Cent. R. Co., 257 Ill. 491, at page 494, the court expressed the reasoning as follows: "Such contracts, if sustained, would relieve the carrier from its essential and important duties to the public growing out of the character of its employment and tend to defeat the foundation principle on which the law of common carriers is based,—that is, the securing of the highest care and diligence in the performance of the important duties due to the public."

When an employer has attempted to avoid obligations arising from his negligence to the employee by contract, Illinois has again followed the general rule

17

that such a contract is void. 35 Am. Jur., Master & Servant, sec. 136, p. 565. In Illinois the employer-employee decisions have been based upon the social relationship of the parties. Jackson v. First Nat. Bank, 415 Ill. 453, 460. The earlier decisions do not cite explicitly any reason for the doctrine. American Jurisprudence, supra, at page 566, explains the reasoning on the basis that "there shall be no relaxation of the rule of law which imposes the duty of care on the part of the employer toward the employed." But many courts have stated the reason is the inequality of the bargaining strength of employer and employee. 37 Harvard Law Review 248, 249. Williston takes this viewpoint too. ". . . a relation often represents a situation in which the parties have not equal bargaining power; and one of them must either accept what is offered or be deprived of the advantages of the relation." Williston on Contracts, Vol. 6, sec. 1751C, page 4968.

It is generally held that innkeepers cannot relieve themselves by contract from the use of ordinary care, by themselves or their employees, in the protection of the guest's property. Williston on Contracts, Vol. 6, sec. 1751C, p. 4973. That ruling is based upon the theory that the parties are not on an equal footing and that the guest must be protected against contractual limitations on the innkeeper's liability, and that such contracts are, therefore, contrary to public policy and void. See 175 A. L. R. 149. The reasoning of this holding is the same as was used to justify the strict rule of carrier liability: that is, a disparity in position between the parties contracting, in that the guest's need for the services are urgent and that he must rely on the integrity of the innkeeper, who is better able to prevent a loss than is the guest. 28 Am. Jur., Innkeepers, sec. 68, p. 587. In Illinois an Innkeepers Act (Ill. Rev. Stats. 1957, chap. 71) limits the liability of

18

innkeepers in sections 1 and 3, but in each case adds the phrase "unless such loss or injury shall occur through the fault or negligence of the said hotel proprietor or through his servants or employees in said hotel." The rule in Illinois is therefore clear that the innkeeper is only liable for the loss of a guest's property where there was negligence on the part of the innkeeper or his servants or employees. Burton v. Drake Hotel Co., 237 Ill. App. 76, 82–84; 21 I. L. P., Innkeepers, sec. 13, p. 786. Such contracts as we are considering are, therefore, void in Illinois, based upon the common-law and reinforced by the statute.

In the bailee-bailor relationship the general rule is stated in Williston on Contracts, Vol. 6, sec. 1751C, p. 4972, as follows:

"Although there is nothing in the ordinary personal relationship of bailor and bailee for hire which puts the parties on such an unequal footing that they cannot by contract limit the amount of the bailee's liability for loss or damage respecting the bailment, bailees rendering duties of public service, such as warehousemen, garage-keepers, parking-space proprietors, and airports, may not by contract relieve themselves of their common-law duty of due care."

And that is unequivocally confirmed in 20 Cornell Law Quarterly 357. The Illinois rule is not so clear. The annotator in 175 A. L. R. at page 115 says that certain jurisdictions, including Illinois, have definitely committed themselves to the proposition that any provision limiting the liability of a professional bailee for negligence is invalid, and cites the case of Weinberger v. Werremeyer, 224 Ill. App. 217, as authority for that statement. A consideration of that case probably does not warrant the broad construction given it by the annotator. The court does however insist that the important thing in the case is the fact that the agent of

19

the garage operator was negligent. It was established that the bailor had read a sign in the garage which had attempted to limit the bailee's responsibility. The court said that this notice could not relieve the bailee from the liability for the negligent acts of himself or his servants. But the court does not make it clear whether it was the insufficiency of the notice to create a binding contract or whether it was that such a contract, if created, would be contrary to public policy and void. But the case does carry implications that the courts of Illinois do not look with favor on such contracts. The rule in regard to mutual benefit bailments is divergent, for it was held in Jacobs v. Grossman, 310 Ill. 247, 250, a pawnbroker's case, that such parties may increase or diminish their rights by stipulation. No Illinois cases were cited, but the Jacobs case was cited with approval in Schoen v. Wallace, 334 Ill. App. 294, 297. This does not change the rule in regard to the so-called professional bailees for hire. In warehouse cases (Colonial Sugar Co. v. Railway Terminal & Warehouse Co., 191 Ill. App. 40, and Kidd & Company v. North American Provision Co., 249 Ill. App. 28) it is held that a warehouse company cannot exempt itself from liability for negligence by stipulation in its warehouse receipt that all loss or damage shall be at the owner's risk. Both of these cases, however, are grounded in the provisions of the Warehouse and Storage Act, and indicate a relationship where the legislature has stepped in to make it impossible to avoid liability for negligence by exculpatory clauses. It is certain that both by statute and by decision, Illinois finds contracts to relieve from the liability for negligence in the bailee-bailor relationship—if not void, of doubtful validity.

The consideration of these typical relationships indicates how far the different jurisdictions have gone

20

to hold contracts which have attempted to disavow the liability for negligence invalid. The desi. and perhaps the felt necessity for the result, are a great deal more persistent and consistent than any reasoning or logic in achieving the results. No one of the various ideas used to justify the actions can be said to apply, in any jurisdiction, through all relationships, nor to apply to any one of the relationships through all jurisdictions.

We now come to the relationship of landlord and tenant, which is herein involved, and the validity of contracts relieving the parties from their obligations in the use of due care in that relationship. It is the majority rule that such contracts are valid, contrary to the rule relating to the other relationships we have considered. The rationale which upholds the validity of such exculpatory clauses is based entirely upon the doctrine of the freedom of contract, which supposedly rests squarely on the respective constitutions. It has sometimes been said that the relationship of landlord and tenant is not a matter of public interest, but is purely a private affair. Such contracts have been declared void by statute, and courts have so held by construction of clauses and direct decision, exercising practically any and all of the methods of reasoning used in regard to other relationships which we have discussed.

At the extreme end, in holding such contracts void, is, again, New Hampshire. In a case where there had been a specific agreement to hold the landlord harmless because of his failure to maintain the stairs and common passageways, the court specifically repudiated the validity of that agreement and said: "But however this may be, the whole answer to this contention of the defendant is to be found in our rule that one may not by contract relieve himself from the con-

21

sequences of the future non-performance of his common-law duty to exercise ordinary care." Papakalos v. Shaka, 91 N. H. 265, 268.

Originally, in New York, it was held that covenants between the landlord and tenant to relieve the landlord of his obligation to repair were valid and not contrary to public policy, and that such matters were of no public concern and neither party was under any form of compulsion to make any stipulations in regard to relieving from liability. Kirshenbaum v. General Outdoor Adv. Co., 258 N. Y. 489. However, under the New York Multiple Dwelling Law, sec. 2, courts refused to give an immunity arising out of contract provisions exempting the landlord from liability for his negligence. Excellent Holding Corp. v. Richman, 279 N. Y. S. 587. The court later, referring to the 1937 enactment, hereinafter quoted, gave as a reason for its validity that while an individual contract exempting a landlord from liability for his negligence may not be of any public concern, the existence of a large number of similar agreements unquestionably was a matter of public concern. Katz, Inc. v. East 30th Street Corp., 172 Misc. 873, 16 N.Y.S.2d 640. In 1937 the legislature of New York made effective this modern feeling in the following amendment to the law:

"Every covenant, agreement or understanding in or in connection with or collateral to any lease of real property exempting the lessor from liability for damages for injuries to person or property caused by or resulting from the negligence of the lessor, his agents, servants or employees, in the operation or maintenance of the demised premises or the real property containing the demised premises shall be deemed to be void as against public policy and wholly unenforceable." (Real Property Law, sec. 234.)

The language of this amendment resolves any possible doubt as to the public policy of the state in regard to

22

exculpatory clauses. Its validity was upheld by the courts of New York. Billie Knitwear, Inc. v. New. York Life Ins. Co., 174 Misc. 978, 22 N.Y.S.2d 324.

Massachusetts somewhat later passed a similar law (Mass. Gen. Laws (Ter. Ed.) chap. 186, sec. 15), and that enactment has also been upheld by the courts of Massachusetts as being a valid exercise of legislative authority, and established the public policy of that state.

A discussion of the legislative change of public policy in these important jurisdictions is contained in the article "Exculpatory Clauses in Leases" by James C. Rehberg, 15 Georgia Bar Journal 389, 396–400. The author on page 404 concludes his article with the following summary: "New York and Massachusetts appear to have been fairly successful in their search for a solution; the conditions which brought about a legislative change in these two states are becoming quite common in other states." Other states have enacted laws which have apparently affected, in part, the question of public policy in such clauses relating to certain situations of landlords and tenants. Some of the states which have enacted these so-called partial legislative changes, are as follows: Connecticut (Gen. Stats., secs. 4049, 4050 (Rev. of 1949); Massachusetts (Ann. Laws, chap. 144, secs. 1, 66 (1949); New Jersey Stats. Ann., Title 55, sec. 7—1 (1940); Pennsylvania Stats. Ann. (Purdon, 1948), Title 53, sec. 9099.

Many states have apparently sought to avoid the social implications of absolving people from their obligation to use due care by contract, in the strict construction of the clauses to escape their operation. In a note by Michael J. Georgalas in Vol. 15 Univ. of Pitt. Law Review 493, at page 496, the annotator comments as follows:

"The examination of the exculpatory clause in the light of public policy and social relationship theories

23

has resulted in a reluctance in the courts to recognize and uphold such agreements. This reluctance is manifested in the rule demanding a strict construction of the exculpatory clause against the party relying upon it. One method of effectuating this rule is to construe the clause as not including exemption from liability from negligence unless it expressly so provides."

In a note to the annotation in 175 A. L. R. 8, at page 89, there are cited several examples of strained construction, and on page 90 it is said: "The process of emasculating the exemption clauses by the expedient of strict construction is apparently little influenced by the language of the clause."

█ █ In Illinois we start with the proposition "that where only a portion of the premises is rented and the landlord retains control of other parts of the same such as stairways, passageways, or cellarways, or where he rents the premises to several tenants, retaining control over a part of the same for the common use of the several tenants, he has the duty of exercising reasonable care to keep the premises in a reasonably safe condition and he is liable for an injury which results to persons, lawfully in such place, from failure to perform such duty." Murphy v. Illinois State Trust Co., 375 Ill. 310, 313–314. It is proper to note that the operators of passenger elevators in buildings for the use of the occupants and those having business with or visiting them, are common carriers of passengers, with the same obligations as carriers by other modes of conveyance. Steiskal v. Marshall Field & Co., 238 Ill. 92, 96, 99. Quaere: Does that mean that exculpatory clauses in leases are void as they relate to negligence in maintenance and repair of elevators, but are valid as to negligence in the maintenance of halls and stairways?

In the instant case the pleadings set forth that the plaintiff occupied a certain portion of the building at

24

31 North State Street in pursuance of the lease. That lease is in evidence. It is executed on a printed form, which is entitled, "Office Lease, Form B, Revised 1950, Copyright 1950 by the Buildings Managers' Association of Chicago," and from that fact it can be inferred that such leases are frequently used for office-leased premises in the City of Chicago. Plaintiff's pleadings also set forth that the lease was submitted to him on or about December 1, 1952 and he was told by the landlord or its duly authorized agent to sign and return it to the defendant prior to January 1, 1953 or he would have to vacate the premises. It is not necessary to set forth again all the facts concerning the importance of the lease to the lessee, and his position as to bargaining power.

The social impact of the landlord-tenant relationship is primarily an urban problem. This is apparent because the jurisdictions where legislation has been enacted and the greater number of cases has been presented to the courts, are the jurisdictions containing large urban areas. As far as residences are concerned, a much larger percentage of people live in rented apartments in the large cities than in the smaller communities. In rural communities, if living quarters are rented, they are more apt to be small homes where the lessee shares no common premises and the lessor has no control of the property. Business houses in smaller communities more generally own their own places of business and do not rent; or, if they rent, they rent the entire premises and are liable for the entire maintenance of the quarters where they conduct their store. Office Buildings in rural communities are not so large and there is not so much traffic in the corridors, stairs and elevators as there is in the large city skyscraper office-commercial-building. All these factors create a special social problem.

There is another difference, in that in large cities, due to such organizations as real estate boards, mana-

25

gers' associations and large renting agencies, there has developed the use of a lease which is very generally uniform in its terms.

Under this factual situation let us consider the various theories and reasons assigned, in Illinois and in other jurisdictions, to hold void clauses relieving a party from his negligence. The terms used are indefinite and the thinking seems lacking in precision, so that it is nearly impossible to classify the various bases. Still it appears that the reasoning channels itself into two general categories: (1) If the parties who signed the contract were unequal in their bargaining power, and (2) If there was some social relationship between the parties that would render the contracts unconscionable. Those two ideas have often been so intermingled that it cannot be clearly stated that the court is relying on one or the other of the ideas.

In Illinois such contracts, between carriers and passengers, have been held void, based upon the semi-public duty of a common carrier. This seems to indicate that it would fall into the category of a situation affecting the social relationship. It does not appear entirely clear, however, how the extra duty placed upon a carrier affects the problem of social living. Is it more socially desirable that people should travel freely and without danger than that they should have a safe place to live and to work, where their daily goings and comings will not be rendered more hazardous to them because they have agreed to relieve a landlord from liability for his negligence? In other jurisdictions it has been held that the main factor in holding the carrier contracts void, is the relative bargaining power of the parties. It is not always clear whether the difference in relative bargaining power is a separate cause or whether it is simply one of the elements which creates an undesirable social situation.

But in what way is a passenger in a less favorable position to bargain than a tenant? Is that trip more necessary than a roof over one's head or a place to carry on one's business? Can the passenger not give up his trip more easily, and therefore bargain even more freely?

Again, in Illinois it has been held that contracts relieving the employer from negligence, as far as the employee is concerned, are void because of the social relationship. Certainly the common law was right when it imposed upon the employer the obligation to furnish a safe place to work. But is it any more important that a man should have a safe place to work than that he should have a safe place to live, and is there any more reason in the employer-relationship that the employer should not be allowed to avoid liability for his negligence than there is that a landlord should not be able to avoid the liability for his negligence in maintaining the common areas which must be used by people to attain ingress and egress where they rent a portion of the premises? Is safety while working more important than safety while living? Many other jurisdictions have held these employer-employee relationships void because they have said there is no equality in bargaining power. Is that a part of a social relationship? Men certainly have to work. Employers as a class control the job supply. Of course the employees need not eat, and could scorn jobs at will. Men also have to have a place to live. Landlords as a class control the supply of rentable premises. Of course tenants could leave the community. They could buy a house. But essentially, are they not under the same compulsion as the employees?

In so far as the innkeeper and guest relationship is concerned, it is fixed by statute in Illinois that the innkeeper cannot limit his liabilty to a guest where the loss or injury shall occur through the fault or

negligence of the hotel proprietor or through his servants or employees in the hotel. (Ill. Rev. Stats. 1957, chap. 71, Innkeepers, secs. 1 and 3.) It is of course true that a statutory right conferred on a private party, but affecting the public interest, may not be waived if the waiver contravenes statutory policy. Brooklyn Sav. Bank v. O'Neil, 324 U. S. 697; Foreman v. Holsman, 10 Ill.2d 551, 554. Therefore, by statute, the State of Illinois has declared such contracts to be void. It is true that this relationship is a semi-public relationship, such as exists between carriers and passengers. Is the consideration there a question of social relationship, or of unequal bargaining power? The reasoning in most jurisdictions seems to encompass both ideas. It generally indicates that when a stranger comes to town there is no place to stay but the inn, and therefore he is not in an equal bargaining position. And it further emphasizes that, having been compelled to stay at the inn, the guest is not able to control the operation of the inn, to select the employees or to guard himself against loss or damage which might occur to him or his property, and that therefore there is a social relationship which justifies holding the innkeeper liable for the negligence of himself and his employees. There is in this social relationship an idea of superiority or advantage which is closely akin to the idea of inequality in bargaining power. Is the guest at the inn under greater compulsion to find shelter than the tenant who comes to town to live and work and seeks shelter for himself and family? Can he control the public areas of the place where he lives and works better than the guest can at the inn?

In Illinois, due to the various types of bailments, the rule is not as unequivocal that the bailee cannot avoid his obligation to use due care by contract. Still, by statutory enactment in certain relationships it is rendered certain, and by decisions in others it is prob-

able, that a bailee for hire cannot avoid his negligence by contract. It is the general rule that professional bailees for hire cannot relieve themselves by contract from their common-law duty of due care. Williston on Contracts (Vol. 6, sec. 1751C, p. 4972) says that rule is not based upon the theory that the bailee-bailor relationship places the parties on an unequal footing. On the other hand, it is said in a note to 175 A. L. R. 112, above referred to, that the reason these bailees for hire cannot relieve themselves from their common-law duty of due care is, actually, because the parties are unequal in their bargaining power, as the bailor, being in need of the services to be rendered by the bailee and in no position to take his trade elsewhere, is compelled to agree to the terms stipulated by the bailee. If the reasoning of this general rule is based on the unequal bargaining power, it is difficult to understand how there is any less freedom of choice for an automobile owner, looking for a place to store his car, than there is for a tenant renting a garage in connection with renting his living quarters. The anomalous situation which results from the fact that the bailee cannot be relieved of his duty to use ordinary care by contract, while the landlord can, is graphically described in an article by Charles C. Arensberg, entitled "Limitations by Bailees and by Landlords of Liability for Negligent Acts." 51 Dickinson Law Review 36. He points out that if a lady signed a lease for an apartment and garage space, with the customary exculpatory clauses in it, and if that lady left the car in the garage with the attendant and the next morning the car was gone, following the reasonings of the courts that the leasing of the garage space was purely a private matter of private business, the exculpatory clause would be valid and Lady Number 1 could not recover; while if Lady Number 2 delivered her car to a parking lot, with the key in the ignition and paid the

29

parking fee and received a check stating "Not responsible for fire or theft," and the next morning she returned to get her car, and it had been stolen, that she could recover, because the bailee could not exempt himself from his common-law duty to use due care.

It therefore appears that in four out of five typical relationships, where negligence is attempted to be waived, that for some reason or other such contracts are held to be void and that the grounds upon which they are so held are indefinite, but in nearly all cases can be matched by similar grounds in the fifth relationship—that of landlord and tenant, where the contracts are held to be valid.

The public policy of freedom of contract is a mutual affair. How much do the rulings of the courts, in holding exculpatory clauses in leases valid, really protect freedom of contract and therefore enforce that public policy? We have already pointed out that the contract in this case, as shown by the record, is a form contract. In the case of O'Callaghan v. Waller & Beckwith Realty Co., 15 Ill.App.2d 349, which was recently decided by this division of the Appellate Court for the First District and to which we previously referred, the lease was a Chicago Real Estate Board form contract. In an article on Basic Principles of Real Estate Leases by David Levinson (Vol. 1952 Univ. of Ill. Law Forum 321, at p. 328), the author says: "In most forms (of leases) there is also a covenant exonerating the landlord from any liability for injury or damage arising out of the condition of the premises." It can probably be assumed from these two examples and from the statement of this eminent authority, that a large part of the leases are executed upon such forms in this modern day. This brings into sharp focus the statements of the New York courts, that the execution of one exculpatory clause was not a matter of public concern, but that the execution of numerous exculpa-

30

tory clauses became a matter of social consequences and made the leases a matter of social relationship. Katz, Inc. v. East 30th Street Corp., 172 Misc. 873, 16 N.Y.S.2d 640.

When such form leases are made it is highly improbable that each of the printed clauses in the leases is subject to negotiation as a matter of offer and acceptance and therefore a matter of freedom of contract. It can be safely assumed that, as the pleadings in the instant case show, such leases are usually submitted as a matter of take-it-or-leave-it. This applies not only to leases, but arises in other situations where in modern society standard forms are used. Professor Friedrich Kessler, in Vol. 43 Columbia Law Review 629, considers the effect of the use of such standard form contracts upon the doctrine of freedom of contract. He considers the standard form contracts in insurance matters, but what he has to say is applicable to the use of standard provisions in leases. He calls them "contracts by adhesion." On page 632 of that article he says: "Standard contracts are typically used by enterprises with strong bargaining power. The weaker party, in need of the goods or services, is frequently not in a position to shop around for better terms, either because the author of the standard contract has a monopoly (natural or artificial) or because all competitors use the same clauses. His contractual intention is but a subjection more or less voluntary to terms dictated by the stronger party, terms whose consequences are often understood only in a vague way, if at all." This concept does not affect the actuality of consent or the binding nature of the agreement, but it does suggest that there remains little of the element of liberty to contract as one chooses, which is the essence of the public policy of freedom of contract. Does not it also suggest that where, in determining the validity of a particular clause, on one side

31

stands the well established policy of the law that a person is liable for the negligent performance of his duty, and on the other side this fragment of a liberty —often limited by legislation and judicial decision, perhaps the policy of responsibility should be superior? Perhaps it suggests: If one seeks to avoid liability on the basis of a clause in a lease the validity of which depends on the public policy of freedom of contract, should he not be required to show that there was actually freedom of contract in regard to that particular clause?

Michael J. Georgalas (Vol. 15 Univ. of Pitt. Law Review 493), in concluding his discussion of this matter, reasons this way:

"Freedom of contract, although theoretically desirable as one of our fundamental rights, must not be examined in an intellectual vacuum. The circumstances of the parties often show that freedom of contract is merely a high sounding phrase resulting in a tenant's being uncompensated for damages suffered as the consequence of negligence by his landlord or those acting for him, simply because he could not rent living space from anyone except by accepting this delimitation of his rights."

He then contemplates the results if exculpatory clauses in leases be held void by statute, and the same rationale would apply to actions by judicial decision, and says:

"The landlord would be deprived of his 'right' to enter into an agreement with his tenant whereby he could escape altogether the just compensation due the injured tenant even though his negligence causes the tenant's injury. Can it really be said and actually meant that the lessor has such a *right* in a modern society? It is submitted that society would be better served if the lessor could not escape his obligations by contracting away liability for negligence."

 Again we are compelled to say, in this case, that the lease, like most form leases, was tendered on a take-it-or-leave-it basis and there was tremendous economic pressure upon the plaintiff to adhere to the lease. Still, public policy cannot be determined on the hardship of an individual case. As in the Jackson case, the man's business was his own private affair. As in the Jackson case, it was business property that was leased. In the same sense the parties dealt at arms length, as in the Jackson case. Perhaps there remained in plaintiff a limited freedom to contract. As in the Jackson case, the injury occurred in premises under the control of the landlord, in a passageway. The plaintiff signed the lease containing the exculpatory clause and there is no evidence that he attempted further negotiation on the particular clause or complained as he signed. He thus set himself apart from the public at large, his customers or employees. It would be futile and lead to confusion to attempt to make distinctions where no real difference exists. We are therefore bound by the decision in the case of Jackson v. First Nat. Bank, 415 Ill. 453.

The judgment is affirmed.

Affirmed.

BURKE, P. J. and FRIEND, J., concur.

SUPPLEMENTAL OPINION AND RULING ON PETITION FOR REHEARING

We have held the Petition for Rehearing in this case, pending the results of the appeal to the Supreme Court in the case of O'Callaghan v. Waller & Beckwith, 15 Ill.App.2d 349, mentioned in our opinion.

We have considered the opinion of the Supreme Court in the O'Callaghan case, in which the Supreme

Court has again declared that the public policy of the State of Illinois in regard to freedom of contract determines that contracts of a landlord relieving himself from all negligence to his tenant are valid.

In view of that decision we are constrained to deny the Petition for Rehearing.

Rehearing denied.

FRIEND, P. J. and BURKE, J., concur.