[L. A. No. 26984. In Bank. July 9, 1963.]

OLGA TUNKL, as Executrix, etc., Plaintiff and Appellant, v. THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and Respondent.

Caidin, Bloomgarden & Kalman and Newton Kalman for Plaintiff and Appellant.

Edward I. Pollock, William Jerome Pollack and Morris L. Marcus as Amici Curiae on behalf of Plaintiff and Appellant.

Belcher, Henzie & Fargo, Leo J. Biegenzahn and William I. Chertok for Defendant and Respondent.

TOBRINER, J.—This case concerns the validity of a release from liability for future negligence imposed as a condition for admission to a charitable research hospital. For the reasons we hereinafter specify, we have concluded that an agreement between a hospital and an entering patient affects the public interest and that, in consequence, the exculpatory provision included within it must be invalid under Civil Code section 1668.

Hugo Tunkl brought this action to recover damages for personal injuries alleged to have resulted from the negligence of two physicians in the employ of the University of California Los Angeles Medical Center, a hospital operated and maintained by the Regents of the University of California as a nonprofit charitable institution. Mr. Tunkl died after suit was brought, and his surviving wife, as executrix, was substituted as plaintiff.

The University of California at Los Angeles Medical Center admitted Tunkl as a patient on June 11, 1956. The Regents maintain the hospital for the primary purpose of aiding and developing a program of research and education in the field of medicine; patients are selected and admitted if the study and treatment of their condition would tend to achieve these purposes. Upon his entry to the hospital, Tunkl signed a document setting forth certain "Conditions of Admission." The crucial condition number six reads as follows: "RELEASE: The hospital is a nonprofit, charitable institution. In consideration of the hospital and allied services to be rendered and the rates charged therefor, the patient or his legal representative agrees to and hereby releases The Regents of the University of California, and the hospital from any and all liability for the negligent or wrongful acts or omissions of its employees, if the hospital has used due care in selecting its employees."

Plaintiff stipulated that the hospital had selected its employees with due care. The trial court ordered that the issue of the validity of the exculpatory clause be first submitted to the jury and that, if the jury found that the provision did not bind plaintiff, a second jury try the issue of alleged malpractice. When, on the preliminary issue, the jury returned a verdict sustaining the validity of the executed release, the

court entered judgment in favor of the Regents.[1] Plaintiff appeals from the judgment.

We shall first set out the basis for our prime ruling that the exculpatory provision of the hospital's contract fell under the proscription of Civil Code section 1668; we then dispose of two answering arguments of defendant.

We begin with the dictate of the relevant Civil Code section 1668. The section states: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

The course of section 1668, however, has been a troubled one. Although, as we shall explain, the decisions uniformly uphold its prohibitory impact in one circumstance, the courts' interpretations of it have been diverse. Some of the cases have applied the statute strictly, invalidating any contract for exemption from liability for negligence. The court in *England* v. *Lyon Fireproof Storage Co.* (1928) 94 Cal.App. 562 [271 P. 532], categorically states, "The court correctly instructed the jury that: 'The defendant cannot limit its liability against its own negligence by contract, and any contract to that effect would be void.' " (P. 575.) (To the same effect: *Union Constr. Co.* v. *Western Union Tel. Co.* (1912) 163 Cal. 298, 314-315 [125 P. 242].)[2] The recent case of *Mills* v. *Ruppert* (1959) 167 Cal.App.2d 58, 62-63 [333 P.2d 818], however, apparently limits " [N]egligent . . . violation of law" exclusively to statutory law.[3] Other cases hold that

---

[1]Plaintiff at the time of signing the release was in great pain, under sedation, and probably unable to read. At trial plaintiff contended that the release was invalid, asserting that a release does not bind the releasor if at the time of its execution he suffered from so weak a mental condition that he was unable to comprehend the effect of his act (*Perkins* v. *Sunset Tel. & Tel. Co.* (1909) 155 Cal. 712 [103 P. 190]; *Raynale* v. *Yellow Cab Co.* (1931) 115 Cal.App. 90 [300 P. 991]; 42 Cal. Jur.2d, Release § 20). The jury, however, found against plaintiff on this issue. Since the verdict of the jury established that plaintiff either knew or should have known the significance of the release, this appeal raises the sole question of whether the release can stand as a matter of law.

[2]Accord, *Hiroshima* v. *Bank of Italy* (1926) 78 Cal.App. 362, 377-378 [248 P. 947]; cf. *Estate of Garcelon* (1894) 104 Cal. 570, 589 [38 P. 414, 43 Am.St.Rep. 134, 32 L.R.A. 595].

[3]To the same effect: *Werner* v. *Knoll* (1948) 89 Cal.App.2d 474 [201 P.2d 45]; 15 Cal.L.Rev. 46 (1926). This interpretation was criticized in *Barkett* v. *Brucato* (1953) 122 Cal.App.2d 264, 277 [264 P.2d 978], and 1 Witkin, Summary of California Law 228 (7th ed. 1960). The latter states: "Apart from the debatable interpretation of 'violation of law'

the statute prohibits the exculpation of gross negligence only;[4] still another case states that the section forbids exemption from active as contrasted with passive negligence.[5]

In one respect, as we have said, the decisions are uniform. The cases have consistently held that the exculpatory provision may stand only if it does not involve "the public interest."[6] Interestingly enough, this theory found its first expression in a decision which did not expressly refer to section 1668. In *Stephens* v. *Southern Pac. Co.* (1895) 109 Cal. 86 [41 P. 783, 50 Am. St. Rep. 17, 29 L.R.A. 751], a railroad company had leased land, which adjoined its depot, to a lessee who had constructed a warehouse upon it. The lessee covenanted that the railroad company would not be responsible for damage from fire "caused from any . . . means." (P. 87.) This exemption, under the court ruling, applied to the lessee's damage resulting from the railroad company's carelessly burning dry grass and rubbish. Declaring the contract not "violative of sound public policy" (p. 89), the court pointed out ". . . As far as this transaction was concerned, the parties when contracting stood upon common ground, and dealt with each other as A and B might deal with each other with reference to any private business undertaking. . . ." (P. 88.) The court concluded "that the *in-*

as limited strictly to violation of *statutes,* the explanation appears to make an unsatisfactory distinction between (1) valid exemptions from liability for injury or death resulting from types of ordinary or gross negligence not expressed in statutes, and (2) invalid exemptions where the negligence consists of violation of one of the many hundreds of statutory provisions setting forth standards of care."

[4]See *Butt* v. *Bertola* (1952) 110 Cal.App.2d 128 [242 P.2d 32]; *Ryan Mercantile Co.* v. *Great Northern Ry. Co.* (D. C. Mont. 1960) 186 F.Supp. 660, 667-668. See also Smith, *Contractual Controls of Damages in Commercial Transactions,* 12 Hastings L.J. 122, 142 (1960), suggesting that section 1668 permits exculpatory clauses for all but intentional wrongs, an interpretation which would render the term "negligent . . . violation of law" totally ineffective.

[5]*Barkett* v. *Brucato* (1953) 122 Cal.App.2d 264, 277 [264 P.2d 978].

[6]The view that the exculpatory contract is valid only if the public interest is not involved represents the majority holding in the United States. Only New Hampshire, in definite opposition to "public interest" test, categorically refuses to enforce exculpatory provisions. The cases are collected in an extensive annotation in 175 A.L.R. 8 (1948). In addition to the California cases cited in the text and note 7 *infra,* the public interest doctrine is recognized in dictum in *Sproul* v. *Cuddy* (1955) 131 Cal.App.2d 85, 95 [280 P.2d 158]; *Basin Oil Co.* v. *Baash-Ross Tool Co.* (1954) 125 Cal.App.2d 578, 594 [271 P.2d 122]; *Hubbard* v. *Matson Navigation Co.* (1939) 34 Cal.App.2d 475, 477 [93 P.2d 846]. Each of these cases involved exculpatory clauses which were construed by the court as not applicable to the conduct of the defendant in question.

*terests of the public* in the contract are more sentimental than real'' (p. 95; italics added) and that the exculpatory provision was therefore enforceable.

In applying this approach and in manifesting their reaction as to the effect of the exemptive clause upon the public interest, some later courts enforced, and others invalidated such provisions under section 1668. Thus in *Nichols* v. *Hitchcock Motor Co.* (1937) 22 Cal.App.2d 151, 159 [70 P.2d 654], the court enforced an exculpatory clause on the ground that ''the public neither had nor could have any interest whatsoever in the subject-matter of the contract, considered either as a whole or as to the incidental covenant in question. The agreement between the parties concerned 'their private affairs' only.''[7]

In *Barkett* v. *Brucato* (1953) 122 Cal.App.2d 264, 276 [264 P.2d 978], which involved a waiver clause in a private lease, Justice Peters summarizes the previous decisions in this language: ''These cases hold that the matter is simply one of interpreting a contract; that both parties are free to contract; that the relationship of landlord and tenant *does not affect the public interest;* that such a provision *affects only the private affairs of the parties. . . .*'' (Italics added.)

On the other hand, courts struck down exculpatory clauses as contrary to public policy in the case of a contract to transmit a telegraph message (*Union Constr. Co.* v. *Western Union Tel. Co.* (1912) 163 Cal. 298 [125 P. 242]) and in the instance of a contract of bailment (*England* v. *Lyon Fireproof Storage Co.* (1928) 94 Cal.App. 562 [271 P. 532]). In *Hiroshima* v. *Bank of Italy* (1926) 78 Cal.App. 362 [248 P. 947], the court invalidated an exemption provision in the form used by a payee in directing a bank to stop payment on a check. The court relied in part upon the fact that ''the banking public, as well as the particular individual who may be concerned in the giving of any stop-notice, is interested in seeing that the bank is held accountable for the ordinary and regular performance of its duties and, also, in seeing that di-

[7]See also *Hischemoeller* v. *National Ice etc. Storage Co.* (1956) 46 Cal.2d 318, 328 [294 P.2d 433] (contract upheld as an ''ordinary business transaction between businessmen''); *Mills* v. *Ruppert* (1959) 167 Cal.App.2d 58, 62 [333 P.2d 818] (lease held not a matter of public interest); *Inglis* v. *Garland* (1936) 19 Cal.App.2d Supp. 767, 773 [64 P.2d 501] (same); cf. *Northwestern M.F. Assn.* v. *Pacific etc. Co.* (1921) 187 Cal. 38, 41 [200 P. 934] (exculpatory clause in bailment upheld because of special business situation).

rection in relation to the disposition of funds deposited in [the] bank are not heedlessly, negligently, and carelessly disobeyed and money paid out, contrary to directions given.'' (P. 377.) The opinion in *Hiroshima* was approved and followed in *Grisinger* v. *Golden State Bank* (1928) 92 Cal.App. 443 [268 P. 425].[8]

If, then, the exculpatory clause which affects the public interest cannot stand, we must ascertain those factors or characteristics which constitute the public interest. The social forces that have led to such characterization are volatile and dynamic. No definition of the concept of public interest can be contained within the four corners of a formula. The concept, always the subject of great debate, has ranged over the whole course of the common law; rather than attempt to prescribe its nature, we can only designate the situations in which it has been applied. We can determine whether the instant contract does or does not manifest the characteristics which have been held to stamp a contract as one affected with a public interest.

In placing particular contracts within or without the category of those affected with a public interest, the courts have revealed a rough outline of that type of transaction in which exculpatory provisions will be held invalid. Thus the attempted but invalid exemption involves a transaction which exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation.[9] The party seeking exculpation is engaged

---

[8]Exculpatory clauses were regarded as invalid, although without reference to the public interest doctrine, in *Franklin* v. *Southern Pac. Co.* (1928) 203 Cal. 680, 686 [265 P. 936, 59 A.L.R. 118] (common carrier); *Dieterle* v. *Bekin* (1904) 143 Cal. 683, 688 [77 P. 664] (bailment); *George* v. *Bekins Van & Storage Co.* (1949) 33 Cal.2d 834, 846 [205 P.2d 1037] (bailment, clause upheld as one for declaration of value and not complete exculpation); *Hall-Scott Motor Car Co.* v. *Universal Ins. Co.* (9th Cir. 1941) 122 F.2d 531, 533-534 (California law, clause upheld on ground that transaction not a bailment).

[9]''Though the standard followed does not always clearly appear, a distinction seems to be made between those contracts which modify the responsibilities normally attaching to a relationship which has been regarded in other connections as a fit subject for special regulatory treatment and those which affect a relationship not generally subjected to particularized control.'' (11 So.Cal.L.Rev. 296, 297 (1938); see also Note (1948) 175 A.L.R. 8, 38-41.)

In *Munn* v. *Illinois* (1877) 94 U.S. 113 [24 L.Ed. 77], the Supreme Court appropriated the common law concept of a business affected with a public interest to serve as the test of the constitutionality of state price fixing laws, a role it retained until *Nebbia* v. *New York* (1934) 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469], and *Olsen* v.

in performing a service of great importance to the public,[10] which is often a matter of practical necessity for some members of the public.[11] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards.[12] As a result of the essential nature of the

*Nebraska* (1941) 313 U.S. 236 [61 S.Ct. 862, 85 L.Ed. 1305, 133 A.L.R. 1500]. For discussion of the constitutional use and application of the "public interest" concept, see generally Hall, Concept of Public Business (1940); Hamilton, *Affectation with a Public Interest* (1930) 39 Yale L.J. 1089.

[10] See *New York C. Railroad Co.* v. *Lockwood* (1873) 84 U.S. (17 Wall.) 357, 378-382 [21 L.Ed. 627]; *Millers Mut. Fire Ins. Assn.* v. *Parker* (1951) 234 N.C. 20 [65 S.E.2d 341]; *Hiroshima* v. *Bank of Italy* (1926) 78 Cal.App. 362, 377 [248 P. 947]; cf. *Lombard* v. *Louisiana* (1963) 373 U.S. 267 [83 S.Ct. 1122, 10 L.Ed.2d 338] [Douglas J., concurring] (holding that restaurants cannot discriminate on racial grounds, and noting that "places of public accommodation such as retail stores, restaurants, and the like render a 'service which has become a public interest' . . . in the manner of the innkeepers and common carriers of old."); *Charles Wolff Packing Co.* v. *Court of Industrial Relations* (1923) 262 U.S. 522 [43 S.Ct. 630, 67 L.Ed. 1103] ("public interest" as test of constitutionality of price fixing); *German Alliance Ins. Co.* v. *Lewis* (1914) 233 U.S. 389 [34 S.Ct. 612, 58 L.Ed. 1011, L.R.A. 1915C 789] (same); Hamilton, *Affectation with a Public Interest* (1930) 39 Yale L.J. 1089 (same); Arterburn, *The Origin and First Test of Public Callings* (1927), 75 U.Pa.L.Rev. 411, 428 ("public interest" as one test of whether business has duty to serve all comers). But see *Simmons* v. *Columbus Venetian Stevens Buildings, Inc.* (1958) 20 Ill.App.2d 1, 25-32 [155 N.E.2d 372, 384-387] (apartment leases, in which exculpatory clauses are generally permitted, are in aggregate as important to society as contracts with common carriers).

[11] See *Bisso* v. *Inland Waterways Corp.* (1955) 349 U.S. 85, 91 [75 S.Ct. 629, 99 L.Ed. 911] *New York C. Railroad Co.* v. *Lockwood, supra*; *Fairfax Gas & Supply Co.* v. *Hadary* (4th Cir. 1945) 151 F.2d 939; *Millers Mut. Fire Ins. Assn.* v. *Parker* (1951) 234 N.C. 20 [65 S.E.2d 341]; *Irish & Swartz Stores* v. *First Nat. Bank of Eugene* (1960) 220 Ore. 362, 375 [349 P.2d 814, 821]; 15 U.Pitt.L.Rev. 493, 499-500 (1954); Note (1948) 175 A.L.R. 8, 16-17; cf. *Charles Wolff Packing Co.* v. *Court of Industrial Relations* (1923) 262 U.S. 522 [43 S.Ct. 630, 67 L.Ed. 1103] (constitutional law); *Munn* v. *Illinois* (1877) 94 U.S. 113 [24 L.Ed. 77] (same); Hall, Concept of Public Business, p. 94 (1940) (same).

[12] See Burdick, *The Origin of the Peculiar Duties of Public Service Companies* (1911), 11 Colum.L.Rev. 514, 616, 743; *Lombard* v. *Louisiana, supra,* fn. 10. There is a close historical relationship between the duty of common carriers, public warehousemen, innkeepers, etc. to give reasonable service to all persons who apply, and the refusal of courts to permit such businesses to obtain exemption from liability for negligence. See generally Arterburn, *supra,* fn. 10. This relationship has led occasional courts and writers to assert that exculpatory contracts are invalid only if the seller has a duty of public service. 28 Brooklyn L.Rev. 357, 359 (1962); see *Ciofalo* v. *Vic Tanney Gyms, Inc.* (1961) 10 N.Y.2d 294,

service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services.[13] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation,[14] and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protec-

220 N.Y.S.2d 962 [177 N.E.2d 925]. A seller under a duty to serve is generally denied exemption from liability for negligence; (however, the converse is not necessarily true) 44 Cal.L.Rev. 120 (1956); cf. *Charles Wolff Packing Co.* v. *Court of Industrial Relations* (1923) 262 U.S. 522, 538 [43 S.Ct. 630, 67 L.Ed. 1103, 1109] (absence of duty to serve public does not necessarily exclude business from class of those constitutionally subject to state price regulation under test of *Munn* v. *Illinois*); *German Alliance Ins. Co.* v. *Lewis* (1914) 233 U.S. 389, 407 [34 S.Ct. 612, 58 L.Ed. 1011, 1020, L.R.A. 1915C 1189] (same). A number of cases have denied enforcement to exculpatory provisions although the seller had no duty to serve. See, e.g., *Bisso* v. *Inland Waterways Corp.* (1955) 349 U.S. 85 [75 S.Ct. 629, 99 L.Ed. 911]; *Millers Mut. Fire Ins. Assn.* v. *Parker* (1951) 234 N.C. 20 [65 S.E.2d 341]; cases on exculpatory provisions in employment contracts collected in 35 Am.Jur., Master & Servant, § 136.

[13]Prosser, Torts (2d ed. 1955) p. 306: ''The courts have refused to uphold such agreements . . . where one party is at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence.'' Note (1948) 175 A.L.R. 8, 18: ''Validity is almost universally denied to contracts exempting from liability for its negligence the party which occupies a superior bargaining position.'' Accord: *Bisso* v. *Inland Waterways Corp.* (1955) 349 U.S. 85, 91 [75 S.Ct. 629, 99 L.Ed. 911, 918]; *Hiroshima* v. *Bank of Italy* (1926) 78 Cal.App. 362, 377 [248 P. 947]; *Ciofalo* v. *Vic Tanney Gyms, Inc.* (1961) 13 App.Div.2d 702 [214 N.Y.S.2d 99] (Kleinfeld, J. dissenting); 6 Williston, Contracts (rev. ed. 1938) § 1751C; Note, *The Significance of Comparative Bargaining Power in the Law of Exculpation* (1937) 37 Colum.L.Rev. 248; 20 Corn. L.Q. 352 (1935); 8 U.Fla.L.Rev. 109, 120-121 (1955); 15 U.Pitt.L.Rev. 493 (1954); 19 So.Cal.L.Rev. 441 (1946); see *New York C. Railroad Co.* v. *Lockwood* (1873) 84 U.S. (17 Wall.) 357, 378-382 [21 L.Ed. 627]; *Fairfax Gas & Supply Co.* v. *Hadary* (4th Cir. 1945) 151 F.2d 939; *Northwestern M.F. Assn.* v. *Pacific etc. Co.* (1921) 187 Cal. 38, 43-44 [200 P. 934]; *Inglis* v. *Garland* (1936) 19 Cal.App.2d Supp. 767, 773 [64 P.2d 501]; *Jackson* v. *First Nat. Bank of Lake Forest* (1953) 415 Ill. 453, 462-463 [114 N.E.2d 721, 726]; *Simmons* v. *Columbus Venetian Stevens Buildings, Inc.* (1958) 20 Ill.App.2d 1, 26-32 [155 N.E.2d 372, 384-387]; *Hall* v. *Sinclair Refining Co.* (1955) 242 N.C. 707 [89 S.E.2d 396]; *Millers Mut. Fire Ins. Assn.* v. *Parker* (1951) 234 N.C. 20 [65 S.E.2d 341]; *Irish & Swartz Stores* v. *First Nat. Bank of Eugene* (1960) 220 Ore. 362, 375 [349 P.2d 814, 821]; 44 Cal.L.Rev. 120 (1956); 4 Mo.L.Rev. 55 (1939).

[14]See *Simmons* v. *Columbus Venetian Stevens Buildings, Inc.* (1958) 20 Ill.App.2d 1, 30-33 [155 N.E.2d 372, 386-387]; *Irish & Swartz Stores* v. *First Nat. Bank of Eugene* (1960) 220 Ore. 362, 376 [349 P.2d 814, 821]; Note (1948) 175 A.L.R. 8, 15-16, 112.

tion against negligence.[15] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller,[16] subject to the risk of carelessness by the seller or his agents.

While obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, the above circumstances pose a different situation. In this situation the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer. Since the service is one which each member of the public, presently or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of a compulsory assumption of the risk of another's negligence. The public policy of this state has been, in substance, to posit the risk of negligence upon the actor; in instances in which this policy has been abandoned, it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer.

In the light of the decisions, we think that the hospital-patient contract clearly falls within the category of agreements affecting the public interest. To meet that test, the agreement need only fulfill some of the characteristics above outlined; here, the relationship fulfills all of them. Thus the contract of exculpation involves an institution suitable for, and a subject of, public regulation. (See Health & Saf. Code, §§ 1400-1421, 32000-32508.)[17] That the services of the hospital to those members of the public who are in special need of the particular skill of its staff and facilities constitute a practical and crucial necessity is hardly open to question.

---

[15]See 6A Corbin, Contracts (1962) § 1472 at p. 595; Note (1948) 175 A.L.R. 8, 17-18.

[16]See *Franklin* v. *Southern Pac. Co.* (1928) 203 Cal. 680, 689-690 [265 P. 936, 59 A.L.R. 118]; *Stephens* v. *Southern Pac. Co.* (1895) 109 Cal. 86, 90-91 [41 P. 783, 50 Am.St.Rep. 17, 29 L.R.A. 751]; *Irish & Swartz Stores* v. *First Nat. Bank of Eugene* (1960) 220 Ore. 362, 377 [349 P.2d 814, 822]; 44 Cal.L.Rev. 120, 128 (1956); 20 Corn.L.Q. 352, 358 (1935).

[17]"[P]roviding hospital facilities to those legally entitled thereto is a proper exercise of the police power of the county . . . as it tends to promote the public health and general welfare of the citizens of the county." (*Goodall* v. *Brite* (1936) 11 Cal.App.2d 540, 548 [54 P.2d 510]; see *Jardine* v. *City of Pasadena* (1926) 199 Cal. 64 [248 P. 225, 48 A.L.R. 509].)

The hospital, likewise, holds itself out as willing to perform its services for those members of the public who qualify for its research and training facilities. While it is true that the hospital is selective as to the patients it will accept, such selectivity does not negate its public aspect or the public interest in it. The hospital is selective only in the sense that it accepts from the public at large certain types of cases which qualify for the research and training in which it specializes. But the hospital does hold itself out to the public as an institution which performs such services for those members of the public who can qualify for them.[18]

In insisting that the patient accept the provision of waiver in the contract, the hospital certainly exercises a decisive advantage in bargaining. The would-be patient is in no position to reject the proffered agreement, to bargain with the hospital, or in lieu of agreement to find another hospital. The admission room of a hospital contains no bargaining table where, as in a private business transaction, the parties can debate the terms of their contract. As a result, we cannot but conclude that the instant agreement manifested the characteristics of the so-called adhesion contract. Finally, when the patient signed the contract, he completely placed himself in the control of the hospital; he subjected himself to the risk of its carelessness.

In brief, the patient here sought the services which the hospital offered to a selective portion of the public; the patient, as the price of admission and as a result of his inferior bargaining position, accepted a clause in a contract of adhesion waiving the hospital's negligence; the patient thereby subjected himself to control of the hospital and the possible infliction of the negligence which he had thus been compelled to waive. The hospital, under such circumstances, occupied a status different than a mere private party; its contract with the patient affected the public interest. We see no cogent current reason for according to the patron of the inn a greater protection than the patient of the hospital; we cannot hold the innkeeper's performance affords a greater public service than that of the hospital.

We turn to a consideration of the two arguments urged by

[18]See *Wilmington General Hospital* v. *Manlove* (1961) 53 Del. 338 [174 A.2d 135]; holding that a private hospital which holds itself out as rendering emergency service cannot refuse to admit a patient in an emergency, and comment on the above case in 14 Stan.L.Rev. 910 (1962).

defendant to save the exemptive clause. Defendant first contends that while the public interest may possibly invalidate the exculpatory provision as to the paying patient, it certainly cannot do so as to the charitable one. Defendant secondly argues that even if the hospital cannot obtain exemption as to its ''own'' negligence it should be in a position to do so as to that of its employees. We have found neither proposition persuasive.

As to the first, we see no distinction in the hospital's duty of due care between the paying and nonpaying patient. (But see Rest., Contracts, § 575(1)(b).) The duty, emanating not merely from contract but also tort, imports no discrimination based upon economic status. (See *Malloy* v. *Fong* (1951) 37 Cal.2d 356, 366 [232 P.2d 241]; Rest., Torts, §§ 323-324.) Rejecting a proposed differentiation between paying and nonpaying patients, we refused in *Malloy* to retain charitable immunity for charitable patients. Quoting Rutledge, J. in *President & Directors of Georgetown College* v. *Hughes* (1942) 130 F.2d 810, 827, we said: ''Retention [of charitable immunity] for the nonpaying patient is the least defensible and most unfortunate of the distinction's refinements. He, least of all, is able to bear the burden. More than all others, he has no choice. . . . He should be the first to have reparation, not last and least among those who receive it.'' (P. 365.) To immunize the hospital from negligence as to the charitable patient because he does not pay would be as abhorrent to medical ethics as it is to legal principle.

Defendant's second attempted distinction, the differentiation between its own and vicarious liability, strikes a similar discordant note. In form defendant is a corporation. In everything it does, including the selection of its employees, it necessarily acts through agents. A legion of decisions involving contracts between common carriers and their customers, public utilities and their customers, bailees and bailors, and the like, have drawn no distinction between the corporation's ''own'' liability and vicarious liability resulting from negligence of agents. We see no reason to initiate so far-reaching a distinction now. If, as defendant argues, a right of action against the negligent agent is in fact a sufficient remedy, then defendant by paying a judgment against it may be subrogated to the right of the patient against the negligent agent, and thus may exercise that remedy.

In substance defendant here asks us to modify our decision in *Malloy,* which removed the charitable immunity; defendant urges that otherwise the funds of the research hospital may be deflected from the real objective of the extension of medical knowledge to the payment of claims for alleged negligence. Since a research hospital necessarily entails surgery and treatment in which fixed standards of care may not yet be evolved, defendant says the hospital should in this situation be excused from such care. But the answer lies in the fact that possible plaintiffs must *prove negligence*; the standards of care will themselves reflect the research nature of the treatment; the hospital will not become an insurer or guarantor of the patient's recovery. To exempt the hospital completely from any standard of due care is to grant it immunity by the side-door method of a contractual clause exacted of the patient. We cannot reconcile that technique with the teaching of *Malloy.*

We must note, finally, that the integrated and specialized society of today, structured upon mutual dependency, cannot rigidly narrow the concept of the public interest. From the observance of simple standards of due care in the driving of a car to the performance of the high standards of hospital practice, the individual citizen must be completely dependent upon the responsibility of others. The fabric of this pattern is so closely woven that the snarling of a single thread affects the whole. We cannot lightly accept a sought immunity from careless failure to provide the hospital service upon which many must depend. Even if the hospital's doors are open only to those in a specialized category, the hospital cannot claim isolated immunity in the interdependent community of our time. It, too, is part of the social fabric, and prearranged exculpation from its negligence must partly rend the pattern and necessarily affect the public interest.

The judgment is reversed.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Peek, J., concurred.