OPINION OF THE COURT
Bernard M. Bloom, S.
In this proceeding to judicially settle the final account of proceedings of the executor of the estate of Ethel F. Burger, the petitioner requests approval of the attorneys’ fees to be paid for legal services rendered to the estate, and direction as
*371 The fact that defendant New York University Dental Center is a clinical program associated with an educational institution does not alter this conclusion. Defendant, of course, has a substantial interest in providing its students with clinical experience as part of their education. However, this interest cannot negate the State’s overriding concern in seeing that defendants fulfill their equally important obligation to their patients. That obligation includes ensuring that students are sufficiently prepared and supervised so that the treatment which is provided to human patients is at least at the minimally acceptable reasonable level of skill and care. If defendants cannot fulfill this obligation, they must not hold themselves out as being providers of dental care.
The public policy considerations here are buttressed by the independent obligations owed by defendants to plaintiff arising from the physician-patient relationship between them. This relationship imposes upon the health care provider greater responsibilities than that required in the ordinary commercial marketplace. In the context of that professional relationship "a provision avoiding liability is peculiarly obnoxious.” (15 Williston, Contracts § 1751 [3d ed 1972].)
Also significant in evaluating the provision’s validity are the unequal positions of the parties entering into this agreement, creating a substantial opportunity for abuse. Inequality of bargaining position, where one party "must either accept what is offered or be deprived of the advantages of the relation”, has long been recognized as one of the most important aspects of the type of relationship in which an exculpatory agreement is improper. (Ibid.; 79 NY Jur 2d, Negligence, §6.) Where exculpatory agreements have been upheld, they have frequently been negotiated either in a commercial setting (see, e.g., Kalisch-Jarcho, Inc. v City of New York, supra; Florence v Merchants Cent. Alarm Co., supra) or involved activities such as membership in a private gymnasium (Ciofalo v Vic Tanney Gyms, 10 NY2d 294, supra) or participation in drag-strip racing (Solodar v Watkins Glen Grand Prix Corp., 36 AD2d 552), all voluntary nonessential social activities freely entered into by both contracting parties. (But see, General Obligations Law § 5-326, which has overruled many of the latter group of cases.)
The case at hand presents a very different situation. Because of the crucial importance of clinics, such as defendant, to the population which they serve, their patients cannot be *372 considered to have freely bargained for a substandard level of care in exchange for a financial savings. Rather, they, including the plaintiff herein, use such services because they are the only ones which they can afford. This necessity renders illusory a patient’s supposed freely given consent to absolve of liability for negligence those from whom he or she seeks treatment. Thus, even aside from the deleterious effect which a decision upholding such an agreement could have on the public-at-large, the individual responsibility bestowed upon defendants by the physician-patient relationship, in the context of the disadvantageous position from which plaintiff necessarily entered into the agreement, militates strongly against its propriety.
Defendant argues that we may not invalidate this agreement because the Legislature has specifically acted to proscribe such agreements in particular instances, thereby evincing an intent to foreclose the courts from acting with respect to such agreements in other contexts. However, these statutes (e.g., General Obligations Law § 5-321 [landlords], § 5-322 [caterers], §5-323 [service or maintenance contractors], §5-325 [garages and parking places], § 5-326 [pools, gymnasiums, and places of public amusement or recreation]) were enacted in a piecemeal fashion, and, as one observer has noted, frequently in apparent response to particular problems as they arose (see Brook, Contractual Disclaimer and Limitation of Liability under the Law of New York, 49 Brooklyn L Rev 1). There has never been any indication of a legislative intent to create a comprehensive scheme foreclosing the courts from evaluating the propriety of exculpatory agreements which the Legislature has not addressed, particularly in an area involving licensed regulated professions with standards of care imposed by law. (See, People ex rel. Bennett v Laman, supra; Boll v Sharp & Dohme, supra, 281 App Div, at 574 [Breitel, J., dissenting].)
Other jurisdictions which have addressed attempts by health care professionals to relieve themselves of liability, particularly to those who stand in a disadvantageous bargaining position, have arrived at a conclusion similar to the one we have reached.
In Emory Univ. v Porubiansky (248 Ga 391, 393-394, 282 SE2d 903, 905), the Supreme Court of Georgia refused to enforce a very similar contract in a setting identical to the one herein, stating: "A contract between a medical practitioner and patient must be examined in light of the strong policy of the state to protect the health of its citizens and to *373 regulate those professionals that it licenses. It is this strong interest of the state in the health and health care of its citizens which gives the state the right to regulate the health professional. * * * ’The right to practice medicine is a conditional right which is subordinate to the state’s power and duty to safeguard the public health, and it is the universal rule that in the performance of such duty and in the exercise of such power, the state may regulate and control the practice of medicine and those who engage therein’ ”.
In Tunkl v Regents of Univ. (60 Cal 2d 92, 98-101, 32 Cal Rptr 33, 37-38, 383 P2d 441, 445-446), the Supreme Court of California identified several characteristics helpful in determining if an exculpatory agreement is in violation of public policy as follows: "It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public whó seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.” While the court in Tunkl noted that all of these factors need not be present in every case it found that in that case, which involved a charity hospital, a facility similar to the one here in issue, all of the factors were present.
These identifying factors were also adopted by the Supreme Court of Tennessee in Olson v Molzen (558 SW2d 429) where an exculpatory agreement signed by a patient at an abortion clinic was held to be void. That court aptly noted that the rule that a party may contract against his or her own negligence: ”d[oes] not afford a satisfactory solution in a case involving a professional person operating in an area of public interest and pursuing a profession subject to licensure by the state. The