752 A.2d 631

Gerilynne SEIGNEUR et vir.

v.

NATIONAL FITNESS INSTITUTE, INC.

**No. 6136, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

May 31, 2000.

272

David L. Rubino (Amy Leete Leone, Paul H. Ethridge and McCarthy, Wilson & Ethridge, on the brief), Rockville, for Appellants.

Robert N. Kelly (Jackson & Campbell, P.C., on the brief), Washington, DC, for Appellee.

Argued before DAVIS, SALMON and BYRNES, JJ.

SALMON, Judge.

In this case, we are asked to examine the enforceability of an exculpatory clause found in a fitness club's contract.

On September 4, 1998, Gerilynne Seigneur and her husband James filed a complaint in the Circuit Court for Montgomery County against National Fitness Institute, Inc. ("NFI"). The Seigneurs asserted that Ms. Seigneur was injured as a result of NFI's negligence while she was undergoing an initial evaluation at a fitness club owned and operated by NFI. NFI filed a motion to dismiss the complaint based on an exculpatory clause found in its contract with Ms. Seigneur. Pursuant to Md. Rule 2–332(c), NFI's motion was treated as a motion for summary judgment because matters outside the pleadings were presented to the court. *See also* Rule 2–501. The motion for summary judgment was granted, and the Seigneurs filed this appeal in which they presented a single issue, *viz:* Does the exculpatory clause in the agreement

entered into by the parties validly release NFI from all liability for injuries to Ms. Seigneur caused by NFI's negligence?[1] We answer that question in the affirmative.

## I. *FACTUAL BACKGROUND*[2]

NFI is a Maryland corporation operating an exercise and fitness facility on Shady Grove Road in Rockville, Montgomery County, Maryland. On January 30, 1996, Ms. Seigneur, after deciding to begin a weight loss and fitness program, joined NFI on a one-month trial basis. She selected NFI over its competitors for several reasons: First, NFI was recommended to her by her chiropractor; second, NFI promoted itself as a fitness club that employed "degreed, certified fitness, clinical exercise and health specialists" and "promised to provide programs that are appropriate for your health status and fitness level"; and third, NFI promised to "provide advice based upon scientific evidence."

When she signed her membership contract, Ms. Seigneur had a history of serious lower back problems, including a herniated disc. Moreover, her general physical condition was poor. These facts were disclosed to NFI prior to the accident.

As part of the application process, Ms. Seigneur was required to complete and sign a document entitled "National Fitness, Inc. Health Programs Participation Agreement" ("the Participation Agreement"). Besides informing the customer of NFI's payment and fee collection policies, this agreement contained the following clause:

---

1. Appellants' somewhat more prolix phrasing of the issue presented is as follows:

 Exculpatory clauses that arise out of transactions that adversely affect the public interest are invalid. Appellant, who joined a particular fitness center on the advice of her chiropractor, signed a contract exculpating the fitness center and its staff from liability for negligence in performing their duties, even though they simultaneously promised to provide well-trained staff to perform initial fitness evaluations. Did this transaction adversely affect the public interest?

2. None of the facts set forth in Part I are disputed for purposes of this appeal.

Important Information: I, the undersigned applicant, agree and understand that I must report any and all injuries immediately to NFI, Inc. staff. *It is further agreed that all exercises shall be undertaken by me at my sole risk and that NFI, Inc. shall not be liable to me for any claims, demands, injuries, damages, actions, or courses of action whatsoever, to my person or property arising out of or connecting with the use of the services and facilities of NFI, Inc., by me,* or to the premises of NFI, Inc. Further, I do expressly hereby forever release and discharge NFI, Inc. from all claims, demands, injuries, damages, actions, or courses of action, and from all acts of active or passive negligence on the part of NFI, Inc., its servants, agents or employees.

(Emphasis added.)

Ms. Seigneur signed the Participation Agreement on January 30, 1996. Kim Josties, an NFI employee, then performed an initial evaluation of Ms. Seigneur, in which Ms. Seigneur was first directed to perform various flexibility tests. Ms. Josties next directed her to the weight machines for strength testing. Ms. Seigneur worked on the leg extension machine and then the bench press. She made no complaints after using either of these devices. Ms. Seigneur next used an upper torso weight machine. Ms. Josties placed a ninety-pound weight on this machine and instructed Ms. Seigneur to lift this weight once with her arms. While attempting to lift this load, Ms. Seigneur felt a tearing or ripping sensation in her right shoulder. She instantly reported this to Ms. Josties, but the instructor did not seek immediate medical attention. Instead, Ms. Josties had Ms. Seigneur proceed to the next machine, and shortly thereafter, the initial evaluation was completed.

Ms. Seigneur claims that since this incident, she has had pain and difficulty using her shoulder. In addition, she has undergone shoulder surgery for a condition that her doctor attributed to the use of NFI's upper torso machine.

The Seigneurs' complaint against NFI alleged, *inter alia,* that NFI was vicariously liable because Ms. Josties, as an employee or agent of NFI, was

> negligent in instructing, directing, and/or guiding the [appel-lant] to lift ninety (90) pounds of weight on the upper torso machine in the manner previously described, especially in light of the physical condition of the [appellant] and the physical and exercise history and experience of the [appel-lant], which was, or reasonably should have been known to [Ms. Josties], and in directing the [appellant] to continue with and complete the program evaluation despite her com-plaint of injury.

The Seigneurs additionally claimed that NFI breached its duty to Ms. Seigneur by negligently hiring Ms. Josties, who "lacked sufficient training, experience, certification and/or oth-er qualifications and knowledge to properly, reasonably and safely instruct, direct and guide [Ms. Seigneur] in lifting weights and in the use of the weight equipment." The Seign-eurs also asserted that NFI negligently failed to provide Ms. Josties "with sufficient training and knowledge to properly, reasonably and safely instruct, direct and guide ... [Ms. Seigneur] in lifting weights and in the use of the weight equipment."

On October 28, 1998, NFI filed a motion to dismiss arguing that the exculpatory clause contained in the Participation Agreement was valid and enforceable and that NFI was entitled to judgment as a matter of law. The Seigneurs responded by arguing that the Participation Agreement was a contract of adhesion and that the exculpatory clause was void as against public policy. They also argued that the agreement was unclear and ambiguous, thus precluding summary judg-ment.

## II. *ANALYSIS*

### A. Validity of the Exculpatory Clause

To decide this case, we must first determine whether the exculpatory clause quoted at the beginning of this opinion

unambiguously excused NFI's negligence. In construing the Participation Agreement, we are required to give legal effect to all of its unambiguous provisions. *See Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358 (1999); *Holzman v. Fiola Blum, Inc.* 125 Md.App. 602, 620, 726 A.2d 818 (1999).

Our primary concern when interpreting a contract is to effectuate the parties' intentions. *Nicholson Air Services, Inc. v. Board of County Comm'rs of Allegany County,* 120 Md.App. 47, 63, 706 A.2d 124 (1998). Moreover, when interpreting a contract, the court "places itself in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them and to judge the meaning of the words and the correct application of the language to the things described." *Canaras v. Lift Truck Services,* 272 Md. 337, 352, 322 A.2d 866 (1974).

Not all attempts to limit liability by way of exculpatory clauses are successful. For instance, in *Calarco v. YMCA of Greater Metropolitan Chicago,* 149 Ill.App.3d 1037, 103 Ill. Dec. 247, 501 N.E.2d 268 (1986), the court considered a contract purporting to exculpate the YMCA from liability to a plaintiff who was injured when a weight machine fell on her hand while she was exercising. *Id.* 103 Ill.Dec. 247, 501 N.E.2d at 269. In *Calarco,* the clause in question read:

In consideration of my participation in the activities of the Young Men's Christian Association of Metropolitan Chicago, I do hereby agree to hold free from any and all liability the YMCA of Metropolitan Chicago and its respective officers, employees and members and do hereby for myself, my heirs, executors and administrators, waive, release and forever discharge any and all rights and claims for damages which I may have or which may hereafter accrue to me arising out of or connected with my participation in any of the activities of the YMCA of Metropolitan Chicago. I hereby do declare myself to be physically sound, having medical approval to participate in the activities of the YMCA.

*Id.* 103 Ill.Dec. 247, 501 N.E.2d at 269–70. The *Calarco* Court concluded that the above-quoted clause did

> not contain a clear and adequate description of covered activities, such as "use of the said gymnasium or the facilities and equipment thereof," to clearly indicate that injuries resulting from negligence in maintaining the facilities or equipment would be covered by the release. "Participation in any of the activities of the YMCA" could be read to mean that the exculpatory clause from liability only pertains to participating in the activities at the YMCA, but not to liability from use of the equipment at the YMCA. Pertinent to this case, plaintiff at the time of the occurrence was not even using the equipment herself, but was assisting someone else who was using a universal machine which was apparently stuck. It is unclear whether this was "participation" in an "activity" under the meaning of the clause.

*Id.* 103 Ill.Dec. 247, 501 N.E.2d at 272. Thus, the court held that "the language of the clause here is not sufficiently clear, explicit and unequivocal to show an intention to protect the YMCA from liability arising from the use of its equipment" at the YMCA. *Id.* 103 Ill.Dec. 247, 501 N.E.2d at 273.

*Powell v. American Health Fitness Center of Ft. Wayne, Inc.,* 694 N.E.2d 757 (Ind.Ct.App.1998), is another case in which the Court found that the exculpatory clause in question was too ambiguous to be enforced. In *Powell,* a health club member was injured while using a fitness club's whirlpool. Referring to the exculpatory clause contained in the club's agreement with the injured member, the court stated:

> Nowhere does the clause specifically or explicitly refer to the negligence of American Health. As a matter of law, the exculpatory clause did not release American Health from liability resulting from injuries she sustained while on its premises that were caused by its alleged negligence. Therefore, the exculpatory clause is void to the extent it purported to release American Health from liability caused by its own negligence.

*Powell,* 694 N.E.2d at 761–62; *see also Alack v. Vic Tanny International of Missouri, Inc.,* 923 S.W.2d 330, 337 (Mo.

1996); *Rickey v. Houston Health Club*, 863 S.W.2d 148, 150 (Tex.App.1993).

▇ In the foregoing cases where the clause was held to be ambiguous, the common thread was that the clause did not clearly indicate that the injured party was releasing the health clubs from liability for the clubs' own negligence. Without this clear expression of intent, the courts in those cases felt compelled to invalidate the exculpatory clauses in question. Nevertheless, given the judiciary's reluctance to interfere with the right of parties to contract, courts are almost universal in holding that health clubs, in their membership agreements, may limit their liability for future negligence if they do so unambiguously. 111 Am.Jur.3d, Proof of Facts, § 13 (Vol. 40 1997).

▇ In Maryland, for an exculpatory clause to be valid, it "need not contain or use the word 'negligence' or any other 'magic words.'" *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 266, 686 A.2d 298 (1996); *see also Sanchez v. Bally's Total Fitness Corp.*, 68 Cal.App.4th 62, 79 Cal.Rptr.2d 902, 905 (1998)(same). An exculpatory clause "is sufficient to insulate the party from his or her own negligence 'as long as [its] language ... clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence....'" *Adloo*, 344 Md. at 266, 686 A.2d 298 (quoting *Barnes v. New Hampshire Karting Assn.*, 128 N.H. 102, 509 A.2d 151, 154 (1986)).

In the instant case, there is no suggestion that the agreement between NFI and Ms. Seigneur was the product of fraud, mistake, undue influence, overreaching, or the like. The exculpatory clause unambiguously provides that Ms. Seigneur "expressly hereby forever release[s] and discharge[s] NFI, Inc. from all claims, demands, injuries, damages, actions, or courses of action, and from all acts of *active or passive negligence on the part of NFI, Inc., its servants, agents or employees.*" (emphasis added). Under these circumstances, we hold that this contract provision expresses a clear intention

by the parties to release NFI from liability for all acts of negligence.

In reaching this conclusion, we are in accord with the holding in cases decided in a number of other jurisdictions. *See, e.g., Garrison v. Combined Fitness Centre, Ltd.,* 201 Ill.App.3d 581, 147 Ill.Dec. 187, 559 N.E.2d 187, 190 (1990)(enforcing exculpatory clause "that could not have been more clear or specific" in releasing health club from liability); *My Fair Lady of Georgia, Inc. v. Harris,* 185 Ga.App. 459, 460, 364 S.E.2d 580 (1987)(an exculpatory clause that released the fitness club "from liability for injury caused by any negligence" was valid and enforceable and that the member contractually assumed the risk of injury); *Schlobohm v. Spa Petite, Inc.,* 326 N.W.2d 920 (Minn.1982)(no ambiguity in exculpatory clause that specifically releases spa from liability arising out of negligence).

## B. Public Policy Exception

More than one-hundred years ago, it was noted that "the right of parties to contract as they please is restricted only by a few well defined and well settled rules, and it must be a very plain case to justify a court in holding a contract to be against public policy." *Estate of Woods, Weeks & Co.,* 52 Md. 520, 536 (1879); *see also Boucher v. Riner,* 68 Md.App. 539, 548, 514 A.2d 485 (1986); *Winterstein v. Wilcom,* 16 Md.App. 130, 135, 293 A.2d 821 (1972). This legal principle continues to hold true today.

■ In Maryland, unambiguous exculpatory clauses are generally held to be valid in the absence of legislation to the contrary.[3] *Adloo,* 344 Md. at 259, 686 A.2d 298; *Atty. Griev.*

---

**3.** Examples of where the legislature has passed "legislation to the contrary" are found in section 5–401 of the Courts and Judicial Proceedings Article of the Maryland Code (1998 Repl.Vol.) and section 8–105 of the Real Property Article of the Maryland Code (1996 Repl.Vol.).

Md.Code Ann., Cts. & Jud. Proc. § 5–401 reads:

**Certain construction industry indemnity agreements prohibited.**

A covenant, promise, agreement or understanding in, or in connection with or collateral to, a contract or agreement relating to the

*Comm'n v. Owrutsky,* 322 Md. 334, 350, 587 A.2d 511 (1991); *Sullivan v. Mosner,* 266 Md. 479, 494–96, 295 A.2d 482 (1972); *Baker v. Roy H. Haas Associates, Inc.,* 97 Md.App. 371, 377, 629 A.2d 1317 (1993).

The Court of Appeals, in *Wolf v. Ford,* 335 Md. 525, 644 A.2d 522 (1994), said:

> It is quite possible for the parties expressly to agree in advance that the defendant is under no obligation of care for the benefit of the plaintiff, and shall not be liable for the consequences of conduct which would otherwise be negligent. There is in the ordinary case no public policy which prevents the parties from contracting as they see fit.

*Id.* at 531, 644 A.2d 522 (quoting W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts,* § 68 (5th ed.1984)).

 Three exceptions have been identified where the public interest will render an exculpatory clause unenforceable. They are: (1) when the party protected by the clause intentionally causes harm or engages in acts of reckless, wanton, or gross negligence; (2) when the bargaining power of one party to the contract is so grossly unequal so as to put that party at

construction, alteration, repair, or maintenance of a building, structure, appurtenance or appliance, including moving, demolition and excavating connected with it, purporting to indemnify the promisee against liability for damages arising out of bodily injury to any person or damage to property caused by or resulting from the sole negligence of the promisee or indemnitee, his agents or employees, is against public policy and is void and unenforceable. This section does not affect the validity of any insurance contract, workers' compensation, or any other agreement issued by an insurer.

Md.Code Ann., Real Prop. § 8–105 provides:

**Exculpatory and indemnification clauses.**

If the effect of any provision of a lease is to indemnify the landlord, hold the landlord harmless, or preclude or exonerate the landlord from any liability to the tenant, or to any other person, for any injury, loss, damage, or liability arising from any omission, fault, negligence, or other misconduct of the landlord on or about the leased premises or any elevators, stairways, hallways, or other appurtenances used in connection with them, and not within the exclusive control of the tenant, the provision is considered to be against public policy and void. An insurer may not claim a right of subrogation by reason of the invalidity of the provision.

the mercy of the other's negligence; and (3) when the transaction involves the public interest. *Wolf,* 335 Md. at 531–32, 644 A.2d 522; *Winterstein,* 16 Md.App. at 135–36, 293 A.2d 821.

Ms. Seigneur has not alleged that NFI's agents intentionally caused her harm, or engaged in reckless, wanton, or gross acts of negligence. She does assert, however, that the second and third exceptions are applicable.

Appellants argue that NFI "possess[es] a decisive advantage in bargaining strength against members of the public who seek to use its services." She also claims that she was presented with a contract of adhesion and that this is additional evidence of NFI's grossly disproportionate "bargaining power."

█ It is true that the contract presented to Ms. Seigneur was a contract of adhesion.[4] But that fact alone does not demonstrate that NFI had grossly disparate bargaining power. *See Shields v. Sta–Fit, Inc.,* 79 Wash.App. 584, 903 P.2d 525 at 529. As discussed *infra,* there were numerous other competitors providing the same non-essential services as NFI. The exculpatory clause was prominently displayed in the Participation Agreement and Ms. Seigneur makes no claim that she was unaware of this provision prior to her injury.

█ To possess a decisive bargaining advantage over a customer, the service offered must usually be deemed essential in nature. *See Boucher,* 68 Md.App. at 551, 514 A.2d 485 ("As [teaching the art of parachute jumping] is not of an essential nature, [Parachutes Are Fun, Inc.] had no decisive advantage of bargaining strength against any member of the public seeking to participate."); *Winterstein,* 16 Md.App. at 138, 293 A.2d 821 ("Since [facilitating the plaintiff's participation in a drag race] is not of an essential nature, Wilcom

---

4. "A contract of adhesion has been defined as one 'that is drafted unilaterally by the dominant party and then presented on a "take-it-or-leave-it" basis to the weaker party who has no real opportunity to bargain about its terms.'" *Meyer v. State Farm Fire and Cas. Co.,* 85 Md.App. 83, 89, 582 A.2d 275 (1990)(quoting Restatement (Second) of Conflict of Laws § 187, Comment (b)).

had no decisive advantage of bargaining strength against any member of the public seeking to participate."). In *Schlobohm, supra,* the Court said:

[I]n the determination of whether the enforcement of an exculpatory clause would be against public policy, the courts consider whether the party seeking exoneration offered services of great importance to the public, which were a practical necessity for some members of the public. As indicated above, courts have found generally that the furnishing of gymnasium or health spa services is not an activity of great public importance nor of a practical necessity. For example, in a negligence action brought against a health club and gym, the Court of Appeals of New York in *Ciofalo v. Vic Tanney Gyms, Inc.,* 10 N.Y.2d 294, 297–98, 220 N.Y.S.2d 962, 964, 177 N.E.2d 925, 927 (1961), noted:

Here there is no special legal relationship and no overriding public interest which demand that this contract provision, voluntarily entered into by competent parties, should be rendered ineffectual. Defendant, a private corporation, was under no obligation or legal duty to accept plaintiff as a "member" or patron. Having consented to do so, it has the right to insist upon such terms as it deemed appropriate. Plaintiff, on the other hand, was not required to assent to unacceptable terms, or to give up a valuable legal right, as a condition precedent to obtaining employment or being able to make use of the services rendered by a public carrier or utility. She voluntarily applied for membership in a private organization, and agreed to the terms upon which the membership was bestowed. She may not repudiate them now.

*Schlobohm,* 326 N.W.2d at 926.

Similarly, in *Shields v. Sta–Fit, Inc.,* 79 Wash.App. 584, 903 P.2d 525, 528 (1995), the Court pointed out that:

Health clubs are a good idea and no doubt contribute to the health of the individual participants and the community at large. But ultimately, they are not essential to the state or its citizens. And any analogy to schools, hospitals, housing

(public or private) and public utilities therefore fails. Health clubs do not provide essential services.

We agree with the views expressed in *Schlobohm* and *Shields, supra.* The services offered by the appellee simply cannot be accurately characterized as "essential."

In *Wolf,* an eighteen-year-old woman received a substantial cash settlement for a tort claim. 335 Md. at 528, 644 A.2d 522. The plaintiff invested her money with a stockbroker, intending to use the investment income to pursue a college education. *Id.* She signed a contract with her stockbroker and his employer, Legg Mason, that included an exculpatory clause. The woman later sued the stockbroker and Legg Mason alleging negligence. *Id.* at 530, 644 A.2d 522. In rejecting the suggestion that the exculpatory clause was invalid due to an unequal bargaining advantage, the Court of Appeals said:

> Wolf claims that the very fact that she was eighteen years old and an unsophisticated investor renders the relationship so lopsided as to impose an extraordinary duty upon Ford. We do not accept that notion. Although young, she had attained her legal majority at the time. She was not solicited by Legg Mason; rather, she initiated contact with Ford [the stockbroker]. Wolf was under no compulsion, economic or otherwise, to invest her money in the stock market with Legg Mason or any other securities investment firm. She had numerous options available to her, including placing her money in an interest-bearing bank account or long-term certificates of deposit.

*Wolf,* 335 Md. at 536, 644 A.2d 522.

The Washington metropolitan area, of which Montgomery County is a part, is home to many exercise and fitness clubs. Ms. Seigneur, like Ms. Wolf, was free to choose among scores of facilities providing essentially the same services. *See Martin v. A.C.G., Inc. d/b/a Tan & Tone America,* 965 P.2d 995, 997 (Okla.Civ.App.1998) ("There is no compelling need that an individual user be a member of a particular 'health club' such was the one operated by [a]ppellee."). She also had the option of purchasing her own fitness equipment and exercising at

home or of exercising without any equipment by doing aerobic or isometric exercises. Ms. Seigneur's bargaining position was not grossly disproportionate to that of NFI.

In *Winterstein*, 16 Md.App. at 136–37, 293 A.2d 821, when defining what transactions affect public interests, this Court relied in part on a test enunciated in *Tunkl v. Regents of the Univ. of California*, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). Quoting *Tunkl*, the Court stated that public interests are affected when the transaction

> exhibits some or all of the following characteristics. It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Id.*

With respect to the just-quoted six-factor test, the Court in *Wolf* held:

> Even though these cases [ones decided by the Court of Special Appeals] have not found an activity that is sufficiently connected to the "public interest" so as to invalidate the exculpatory clause, we are concerned that the six-factor test

of *Tunkl,* originally intended to be a rough outline in guiding a court's determination as to whether a given transaction affects the public interest, may become too rigid a measuring stick. Because of the fluid nature of the "public interest," strict reliance on the presence or absence of six fixed factors may be arbitrary. The *Tunkl* Court itself recognized that the public interest does not—and cannot—lend itself easily to definition, because "the social forces that have led to such characterization [of the public interest] are volatile and dynamic. No definition of the concept of public interest can be contained within the four corners of a formula." *Tunkl,* 60 Cal.2d at 98, 383 P.2d at 444, 32 Cal.Rptr. at 36.

We expressly decline, therefore, to adopt the six-factor test set forth in *Tunkl* and relied upon, to varying degrees, by the Court of Special Appeals in the exculpatory clause cases mentioned above. This is not to say that the factors listed cannot be considered by a court in determining whether a given transaction involves the public interest, but the six factors are not conclusive. The ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations.

*Wolf,* 335 Md. at 535, 644 A.2d 522. The *Wolf* Court, in refusing to adopt the *Tunkl* test, identified transactions that affect the public interest as those involving

> the performance of a public service obligation, e.g., public utilities, common carriers, innkeepers, and public warehousemen. It also includes those transactions, not readily susceptible to definition or broad categorization, that are so important to the public good that an exculpatory clause would be "patently offensive," such that "the common sense of the entire community would ... pronounce it" invalid.

*Wolf,* 335 Md. at 532, 644 A.2d 522 (internal quotation omitted).

NFI does not provide an essential public service such that an exculpatory clause would be "patently offensive" to the

citizens of Maryland. The services offered by a health club are not of great importance or of practical necessity to the public as a whole. *See Schlobohm,* 326 N.W.2d at 926. Nor is a health club anywhere near as socially important as institutions or businesses such as innkeepers, public utilities, common carriers, or schools.

Ms. Seigneur supports her argument that health clubs affect the public interest by reference to *Dalury v. S–K–I, Ltd.,* 164 Vt. 329, 670 A.2d 795 (1995). In that case, the Supreme Court of Vermont held that a ski resort was providing an essential public service, and therefore ruled that an exculpatory clause, signed by a patron who was injured while skiing on its premises, was unenforceable. *Id.* at 799. The *Dalury* Court held that the burden to foresee and control hazards should be placed on the ski resort and not the skiers. *Id.* The Court explained that ski resorts, not the skiers, "have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees." *Id.* Moreover, according to the Court, ski resorts can train their employees in risk management. *Id.* In summarizing its reasons for finding that the release in question implicated legitimate public policy concerns, the Vermont Supreme Court stated: "While interference with an essential public service surely affects the public interest, those services do not represent the universe of activities that implicate public concerns." *Id.* Furthermore, the ski resort's reliance on the private nature of the property "would be inconsistent with societal expectations about privately owned facilities that are open to the general public." *Id.*

Ms. Seigneur's reliance upon Vermont law is understandable, but the holding in *Dalury* is against the great weight of authority. *See, e.g., Lund v. Bally's Aerobic Plus, Inc.,* 78 Cal.App.4th 733, 93 Cal.Rptr.2d 169, 172 (2000) (release signed by health club member held to be enforceable after determining that "exculpatory agreements in the recreational sports context do not implicate the public interest,"); *Ciofalo v. Vic Tanney Gyms, Inc.,* 13 A.D.2d 702, 214 N.Y.S.2d 99 (1961) (exculpatory clause in a gymnasium and health club contract

not violative of public policy); *Massengill v. S.M.A.R.T. Sports Medicine Clinic*, 996 P.2d 1132, 2000 WL 149432 (Wyo.) (exculpatory clause in sports medicine clinic contract held not to violate public policy and was enforceable). *See also, Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d at 926 (concluding that exculpatory clause in health spa membership contract "was not against the public interest"); *Martin v. Tan & Tone America*, 965 P.2d at 997 (exculpatory clause in health club contract held not to be a "threat to the public policy"); *Lovelace v. Figure Salon, Inc.*, 179 Ga.App. 51, 345 S.E.2d 139, 140–41 (1986) (health club contract "not void for contravening public policy"); *My Fair Lady of Georgia, Inc. v. Harris*, 364 S.E.2d at 581 (health club exculpatory clause "valid and binding" and is not void as against public policy); *Kubisen v. Chicago Health Clubs*, 69 Ill.App.3d 463, 26 Ill.Dec. 420, 388 N.E.2d 44, 46–47 (1979) (exculpatory clause held not to be in violation of public policy).

Aside from health club or "spa" cases, courts from other jurisdictions almost universally have held that contracts relating to recreational activities do not fall within any of the categories that implicate public interest concerns. *See, e.g., Barker v. Colorado Region–Sports Car Club of America*, 35 Colo.App. 73, 532 P.2d 372 (1974) (race track); *Jones v. Dressel*, 623 P.2d 370 (Colo.1981) (sky diving); *Moss v. Fortune*, 207 Tenn. 426, 340 S.W.2d 902 (1960) (horse and saddle rental).

██ Additionally, a Maryland court "will not invalidate a private contract on grounds of public policy unless the clause at issue is patently offensive." *Wolf*, 335 Md. at 537, 644 A.2d 522. That test was not utilized by the Vermont court in *Dalury*. Moreover, one of the public policy considerations upon which the *Dalury* Court focused, the benefits of risk-spreading, is of no consequence under Maryland law.

## *CONCLUSION*

The following is as true today as when it was first uttered:

I, for one, protest ... against arguing too strongly upon public policy; it is a very unruly horse and when once you get astride it you never know where it will carry you. It may lead you from the sound law. It is never argued at all but when other points fail.

*Anne Arundel County v. Hartford Acc. and Indem. Co.*, 329 Md. 677, 686, 621 A.2d 427 (1993)(quoting *Richardson v. Mellish*, 2 Bing. 229, 130 Eng.Rep. 303 (1824)). As it relates to exculpatory clauses, unless the clause is patently offensive, Maryland has this unruly horse securely in the stable. Here, the clause passes the not patently offensive test.

We affirm the trial court's ruling that NFI's exculpatory clause is enforceable so as to release NFI from liability for injuries Ms. Seigneur sustained while on its premises.

**JUDGMENT AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**